UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 00-50591

———————————————


ALFRED CASTELLANO

Plaintiff-Appellee,


versus


CHRIS FRAGOZO, Etc.; ET AL.,

Defendants,

Chris FRAGOZO, Individually and in his Official Capacity as a San
Antonio Police Officer; Maria SANCHEZ, Individually,

Defendants-Appellants.


Appeals from the United States District Court
for the Western District of Texas


November 20, 2002

Before BARKSDALE and STEWART, Circuit Judges, and DUVAL, District Judge.[1]

STANWOOD RICHARDSON DUVAL, District Judge:

This legal saga began eighteen years ago. The central issues in this suit for malicious

prosecution under 42 U.S.C. § 1983 are: (1) whether the jury instructions constituted reversible

error, (2) whether there was sufficient evidence to support the jury's verdict in favor of the

_____

[1] District Judge of the Eastern District of Louisiana, sitting by designation.

1

plaintiff, and (3) whether there was sufficient evidence to support the award of both economic and compensatory damages. The trial court affirmed the jury's verdict in all respects. For the following reasons, we AFFIRM.

## I. Background Facts

**A. Castellano's Arrest and Criminal Trial for Arson**

Alfred Castellano ("Castellano") is the owner of Fred's Fish Fry ("Fred's"), a collection of fast food restaurants in San Antonio, Texas, which he and his father started in 1963. On October 31, 1984, one of Fred's restaurants ("Fred's No. 7") was destroyed by fire. After investigation, the San Antonio fire department concluded that the fire had been the result of an "inside arson." That conclusion was based, initially, on evidence gathered at the scene of the fire by Alfred Castro ("Castro"), a San Antonio arson investigator (and former defendant in this action), which included jars of gasoline, a disconnected natural gas line from the water heater, and two wrenches found inside Fred's No. 7. Castro's initial opinion was later confirmed by allegations made and evidence produced by Maria Sanchez ("Sanchez"),[2] a former Fred's employee, and Chris Fragozo ("Fragozo"),[3] a San Antonio police officer who worked off-duty as a security officer for Fred's, consisting of: (1) tapes of conversations allegedly held between Sanchez and Castellano wherein Castellano implicated himself in the arson of Fred's No. 7 and (2) Sanchez's sworn testimony that Castellano had tried on previous occasions to burn the restaurant. With that evidence, Castro concluded that there was

---

[2] A few weeks before the fire, Castellano suspected Sanchez of stealing money from the restaurant and requested that she take a polygraph test in accordance with company policies. Sanchez repeatedly refused to take the test and was fired from Fred's a few days after the fire.

[3] Fragozo left his employment with Fred's allegedly after Castellano refused to use his position on the Fire and Police Civil Service Commission to improperly obtain a copy of the lieutenant's test for Fragozo before the test was administered.

2

probable cause to believe Castellano was responsible for the fire.

On November 8, 1984, Castellano was arrested, at his office,  for committing arson on Fred's No. 7.  After entering his place of business, the police immediately grabbed Castellano, placed him in handcuffs, searched his person and office, and took him to the police station.  Thereafter, Castellano remained handcuffed and was seated in a room while he waited to be fingerprinted.  When the press arrived, the police left Castellano in handcuffs while they slowly paraded him through the crowd of reporters towards the front door.  Throughout this ordeal, Castellano was not given the opportunity to call his family or business associates to warn them of the allegations before the story appeared on the evening news.

At the time of his arrest, Castellano was a respected business man, was serving on the Fire and Police Civil Service Commission, and  was active in community politics.  Following his arrest, however, he was asked to resign his position on the Commission. The story and its permutations intermittently appeared on the evening news and in the newspaper for a over a year.

At his criminal trial, the evidence implicating Castellano in the arson was, for the most part, twofold.  First, there was the testimony of  Sanchez who testified that: (1) in the days before the fire, Castellano confided in her that he intended to burn Fred's No. 7 and that he attempted to burn the restaurant on prior occasions; (2) Castellano instructed her to purchase Halloween items for the restaurants--specifying that there should be a candle in Fred's No. 7; and  (3) she related Castellano's plan to burn Fred's No. 7 to Fragozo, who suggested that she tape record her conversations with Castellano so she would not be blamed for the fire.  Those recorded conversations, containing statements allegedly made by Castellano implicating himself  in the arson and other arson attempts, were admitted as evidence of Castellano's guilt.   Also introduced as evidence was the fact that, at

3

the time of the arson, Fred's No. 7 was operating at a loss and Castellano had recently increased his insurance on the restaurant.

Castellano vehemently denied the accuracy of the tape and claimed that Sanchez and Fragozo altered the tapes in an act of revenge. He also introduced an expert witness who testified that the tape was a fraud–created by manipulating conversations between Sanchez and Castellano.

At the conclusion of the criminal trial, the jury convicted Castellano of arson and he was sentenced to five years probation. He subsequently filed three writs of habeas corpus--the third of which was granted by the Texas Criminal Court of Appeals. At the writ hearing, the court heard uncontradicted testimony from Clemencia Jiminez ("Jimenez"), an employee of Fred's that: (1) Sanchez told her, before Castellano's conviction, about the plan to tape record Sanchez's conversations with Castellano and alter them to implicate him in the arson and asked her to corroborate Sanchez's story with the district attorney; (2) after Castellano's conviction, Sanchez told her she "had gotten" Castellano without her help; and (3) Fragozo attempted to enlist her as a witness against Castellano.[4]

The findings of fact issued by the habeas judge following the hearing were adopted by the Texas Criminal Court of Appeals, and included Finding of Fact No. 3 that Fragozo "attempted to enlist Clemencia Jiminez as a witness against [Castellano] and aided Maria Sanchez in altering the tape recordings offered into evidence. The tapes were altered to appear that [Castellano] was admitting to the arson when in fact he had no knowledge of its commission" and Finding of Fact No. 6 that "Sanchez and Fragozo collaborated together and without their testimony and the altered tapes,

---

[4] *Ex parte Castellano*, 863 S.W.2d 476, 478-79 (Tex. Crim. App. 1993).

there is insufficient evidence to sustain a finding of guilt in this case."[5]

Castellano's conviction was overturned and his case was remanded for a new trial in 1993. On remand, however, the district attorney dismissed the case for "lack of evidence" and Castellano's record was later expunged.

## B. Civil Suit for Malicious Prosecution

On September 23, 1994, Castellano filed the instant civil action in the District Court of the 288th Judicial District, Bexar County Texas for malicious prosecution under 42 U.S.C. § 1983 against Fragozo, individually and in his capacity as a San Antonio Police Officer, Sanchez, Castro, and others. Castellano claimed that the defendants maliciously prosecuted him in violation of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights and contended that he had suffered a myriad of damages, including injury to his feelings, reputation, mental health, and character. Castellano also complained that he had been "severely impaired in his social and mercantile standing" and continued to suffer great embarrassment, humiliation, and anguish. Finally, Castellano asserted that his business had lost clientele, profits, and good standing as a direct and proximate result of the criminal prosecution.

The case was subsequently removed to federal court where it was referred to a magistrate judge. Thereafter, on Sanchez's motion for summary judgment, the court dismissed Castellano's malicious prosecution claims based on the Fifth, Sixth, Eighth, and Fourteenth Amendments. Relying on *Albright v. Oliver*[6] and *Johnson v. Louisiana Department of Agriculture*,[7] however, the court

---

[5] *Id.* at 479.

[6] 510 U.S. 266, 274 (1994).

[7] 18 F.3d 318 (5th Cir. 1994).

sustained Castellano's malicious prosecution claims based on alleged violations of his First and Fourth Amendment rights. The court also determined that Castellano's third amended complaint contained sufficient allegations to support his malicious prosecution claim under the Fourth Amendment.[8]

The trial was held in April of 2000. As to his individual damages, Castellano testified that he: (1) was embarrassed from the exposure his case received in the media--even after his conviction was overturned, (2) was asked to resign from his civil service position, (3) was unable to obtain loans to expand his business, and (4) was denied coverage for fire insurance. Castellano also stated that at the time of the fire, he was attempting to franchise his business. He had started a construction company, developed a concept of constructing inexpensive prefabricated buildings, and expended resources hiring legal counsel, preparing literature, and obtaining a license in California. However, Castellano explained that since his conviction for arson, he had been unable to franchise his business and stated that his personal losses stemming therefrom "could have been in the millions."

Also testifying at trial was Castellano's economist, Gene Trevino ("Trevino"), who opined as to the measure of damages Castellano suffered, individually, as a result of his failure to franchise his business after the arson conviction.[9] Specifically, Trevino testified that Castellano's personal economic loss as a result of his inability to franchise his business was $1,200,000. He further explained that this amount was based on the assumption that Fred's would have been able to franchise

_____

[8] Castellano subsequently dismissed his cause of action under the First Amendment.

[9] At trial, defendants objected to the inclusion of Trevino's testimony arguing, in part, that they were unfairly surprised by his testimony because before trial he had only opined as to the amount of damages Fred's sustained--not the amount of damages Castellano suffered *personally* after his conviction, derivative from his business losses. The court permitted Trevino to testify as to the damages that Castellano suffered *personally* as a result of malicious prosecution, such as his loss of executive compensation as a result of being unable to franchise Fred's. However, Trevino was not permitted to testify as to the losses sustained by Fred's.

6

at a rate of one restaurant a year for twelve years and, as such, Castellano could have increased his personal salary by an additional $100,000 per year for each of those years.[10]

Jiminez and Louis Cantu ("Cantu"), both employees of Fred's, also testified at the trial. Jiminez testified that (1) Sanchez and Fragozo attempted to enlist her to "be on their side" during the criminal trial and testify against Castellano and (2) after Castellano's conviction Sanchez stated that she had "done what she set out to do." Cantu testified, *inter alia*, that Fragozo and Castro had come to his home, ordered him into Fragozo's car, and attempted to persuade him to alter the statement he had given previously to the police so as to implicate Castellano in the arson of Fred's. Cantu further explained that Fragozo pointed a gun at him when he refused to change his statement as they requested.

At the close of Castellano's case, Sanchez, Fragozo, and Castro each moved for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(a), arguing, in part, that the law surrounding § 1983 malicious prosecution claims was unsettled.[11] In her Rule 50(a) motion, Sanchez also argued that (1) Castellano had not proved a "lack of probable cause" with respect to the criminal proceedings or her actions, (2) Castellano's complaint did not specify that he was seeking *personal* damages derivative from his business losses after his conviction, and (3) there was insufficient evidence that she conspired with Castro or Fragozo. Fragozo argued that there was

---

[10] Trevino further explained that considering the number of restaurants Castellano opened in the past, his assumption that Fred's would have franchised at a rate of one restaurant a year was conservative.

[11] Defendants explained that they were relying on Judge Edith Jones's concurring opinion in *Kerr v. Lyford,* 171 F.3d 330, 342-343 (5th Cir. 1999) (Jones, E., specially concurring) (addressing, in part, whether a cause of action for malicious prosecution required proof of any post-arraignment seizure).

insufficient evidence to prove that his actions were not objectively reasonable for purposes of qualified immunity. Both motions were denied.

At the close of all the evidence, but before the case went to the jury, the defendants renewed their JMOL motions for the same reasons articulated at the close of Castellano's case. The motions were denied.

Thereafter, the jury instructions and interrogatories were presented to the magistrate judge and discussed at a charge conference before they were read to the jury. At that time, no one objected to the instructions or interrogatories as they related to "malicious prosecution."

Following its general jury instructions as to the types of evidence, credibility of witnesses, burdens of proof, etc., the court provided the following charge for "malicious prosecution":

> . . . Castellano claims that Alfred Castro and Chris Fragozo, while acting under color of law, intentionally violated his constitutional right to due process by maliciously prosecuting him for the criminal offense of arson. Castellano further claims that Maria Sanchez, as an individual, intentionally violated the same constitutional right.
>
> To prove such violation, Castellano must prove each of the following by a preponderance of the evidence: One, the defendants intentionally committed the acts that deprived him of due process; two, in so doing, the defendants acted under "color of law" of the State of Texas; and three the defendants' acts caused his damages.
>
> First, to prove the defendants intentionally committed acts depriving him of due process, Castellano must prove they maliciously prosecuted him for the criminal offense of arson. To prove this claim, Castellano must establish by a preponderance of the evidence each of the following:
>
>> One, the defendants caused or commenced or aided a criminal proceeding against him;
>>
>> Two, the defendants acted without probable cause;
>>
>> Three, the criminal action terminated in his favor;
>>
>> Four, he was innocent of arson;

8

Five, the defendants acted with malice by prosecuting him for arson;

And six, he was damaged by the criminal proceeding.

. . . . .

To determine whether Maria Sanchez committed malicious prosecution you must also determine whether she conspired with another while the other was acting under color of law, and they conspired with the intent to commit malicious prosecution. . . .

In instructing the jury as to the potential damages that they could award, the court explained:

If you find that Castellano was maliciously prosecuted by any of the defendants, then you must determine an amount that is fair compensation for all of Castellano's damages. The purpose of these compensatory damages is to make Castellano whole–that is, to compensate Castellano for the damage that Castellano has suffered. Compensatory damages are not limited to just out-of-pocket expenses that Castellano may have incurred because of his injury. You may award damages for any injury that Castellano sustained, including any mental anguish, loss of earning potential, and /or loss of capacity for enjoyment of life that Castellano has experienced in the past. However, Castellano's compensatory damages may not include actual damages to Fred's Fish Fry, Inc. as a result of the fire or any malicious prosecution. Castellano's damages in relation to Fred's Fish Fry may only include his own damages you find resulted from any damages to Fred's Fish Fry, Inc. as a consequence of any of the defendants' malicious prosecution.

If the plaintiff has proved that the defendants acted with malice or willfulness or with callous and reckless indifference to the safety or rights of others, you may also award punitive damages against them. . . . The amount of an award of punitive damages must not reflect bias, prejudice, or sympathy toward any party. However, the amount can be as large as you believe necessary to fulfill the purposes of punitive damages.

Similarly, the jury interrogatories directed the jury to consider whether, by a perponderance of the evidence, the defendants deprived Castellano of his "constitutional rights by committing malicious prosecution" as defined in the court's instruction. As to damages, the jury interrogatories queried:

Interrogatory No. 4:

What sum of money will fairly and reasonably compensate Castellano

9

for his actual damages, if any, that he proved were the cause-in-fact and proximate cause of the defendants' violation of his constitutional rights? Provide the amount, in any in dollars and cents.

Interrogatory No. 5.:

Do you find from a perponderance of the evidence that the listed defendants acted with malice or wilfulness or with callous and reckless indifference to the rights of Castellano, as defined in the court's instruction?

And, Interrogatory No. 6:

What sum of money will fairly and reasonably compensate the plaintiff for his punitive damages, if any, that he proved resulted from the violation of his constitutional rights by the listed defendants?

Damages were submitted globally to the jury.

On April 17, 2002, the jury rendered its verdict and found that Fragozo, but not Castro, had acted under color of law to deprive Castellano of his constitutional rights by committing malicious prosecution. As to Sanchez, the jury concluded that she had conspired with Fragozo, while he was acting under color of law, with the specific intent to deprive Castellano of his constitutional rights. Accordingly, the jury awarded $3,000,000 in compensatory damages and $500,000 in punitive damages–to be divided evenly between Sanchez and Fragozo.

## C. Post-Trial Motions

Thereafter, Sanchez and Fragozo filed motions for judgment as a matter of law or, in the alternative, a new trial. Therein, they argued that: (1) there was no basis for a § 1983 malicious prosecution claim based on the Fourteenth Amendment; (2) Castellano had not pled a cause of action for malicious prosecution under the Fourth Amendment; (3) Castellano had not proven the elements of the crime of malicious prosecution, including his "actual innocence" as to the arson charge and the lack of probable cause for his criminal prosecution; and (4) the court's jury instruction as to malicious

10

prosecution was erroneous because it suggested that Castellano's cause of action arose under the Fourteenth Amendment–rather than the Fourth Amendment. Sanchez also posited that there was insufficient evidence to establish that she conspired with another individual acting under color of law with the specific intent to violate Castellano's constitutional rights. Fragozo also contended that Castellano failed to prove that he acted with malice.

As to the damage award, Fragozo and Sanchez argued that: (1) Castellano was not entitled to receive *individual* damages that he sustained derivative from damages to his business after his conviction because his complaint was void of any such allegation, (2) the evidence supporting Castellano's request for damages for anticipated future lost profits or future compensation from the failure to franchise Fred's was speculative, (3) they were unfairly surprised by Trevino's testimony because his pre-trial report focused solely on corporate damages, (4) there was insufficient evidence to support a damage award for Castellano's mental anguish under the principles set forth in *Patterson v. PHP Healthcare Co.,*[12] (5) the global jury instruction as to the compensatory and punitive damages was erroneous, and (6) the amount awarded was excessive.

The trial court denied defendants' motions. As to defendants' argument that there was no constitutional cause of action for malicious prosecution, the judge explained that there was no new evidence sufficient to persuade him to alter his prior ruling. Resolving defendants' challenge to their liability for malicious prosecution under the Fourth Amendment,[13] the court determined that it could

---

[12] 90 F.3d 927 (5th Cir. 1996).

[13] The trial court clarified that the issues included within its reasoning for "liability for malicious prosecution" included the sufficiency of evidence as to: (1) Castellano's actual innocence of arson; (2) the existence, *vel non*, of probable cause; and (3) the alleged conspiracy between Fragozo and Sanchez to violate Castellano's constitutional rights.

11

not overturn the jury's verdict because (1) there was sufficient evidence to create an issue of fact as to each element of the crime and (2) the facts and evidence did not point so strongly and overwhelmingly in defendants' favor.

With respect to the jury's award for mental anguish damages, the court stated that under *Patterson*, Castellano's testimony as to his mental anguish, without corroboration, was insufficient to support an award for mental anguish damages. However, the court reasoned that because defendants failed to assert this argument in their Rule 50(a) motion, it was barred from granting their post-trial motions on the issue.[14]

The trial court also denied defendants' motions for a new trial, specifically holding that: (1) the evidence of Castellano's individual damages was not speculative and (2) the damage award was not shocking or inordinately large. The court also noted that because it rejected defendants' challenges to the damage award, its global jury instruction was not erroneous. As to all other issues raised in the motion for a new trial, the court concluded that the verdict was not "against the great weight of the evidence."

## II. Discussion

On appeal, defendants Fragozo and Sanchez have raised the following issues for resolution: (1) whether there exists a cause of action for malicious prosecution for purposes of § 1983 under the Fourth Amendment and, if so, whether the trial court erred in concluding that Castellano had met and pled the prerequisites for such a cause of action;  (2) whether the magistrate judge committed reversible error when he instructed the jury on the basis of  Fourteenth Amendment "due process," instead of Fourth Amendment "unreasonable seizure"; and  (3) whether there was sufficient evidence

---

[14] Citing *Allied Bank-West, N.A.  v. Stein*, 996 F.2d 111, 114-15 (5th Cir. 1993).

12

before the jury (a) that Castellano had been maliciously prosecuted, (b) of a conspiracy between Sanchez and Fragozo, and (c) that, for qualified immunity purposes, Fragozo's actions were objectively unreasonable.

Defendants have also challenged the damage award on the following fronts: (1) whether the trial court erred in denying their motion for a new trial as to the jury award for mental anguish damages; (2) whether the trial court erred in admitting Trevino's testimony because defendants had not received proper notice of the substance of his testimony before trial or because it was speculative; (3) whether Castellano's complaint included a request for personal damages–derivative from the damages sustained by his business after his conviction; (4) whether the $3,000,000 compensatory damage award or the $500,000 punitive damage award was excessive; (5) whether the trial court erred in instructing the jury globally or in instructing the jury that it could consider "loss of capacity for enjoyment of life"; (6) whether criminal defense attorney fees are recoverable under § 1983 and § 1988; and (7) whether the trial court properly permitted Castellano's criminal defense attorney to testify as to his fees without independent recollection, and relying on fee ledgers not produced upon request.

The court will address each issue in turn.

## A. Malicious Prosecution Claim and its Prerequisites Under the Fourth Amendment

In *Albright v. Oliver*,[15] the Supreme Court held that a cause of action for malicious prosecution under the Fourteenth Amendment did not exist. However, the Court did not reach the

---

[15] 510 U.S. 266, 275 (1994).

issue of whether such a right exists under the Fourth Amendment and this circuit interpreted that void as having "left undisturbed our circuit's longstanding recognition of a Fourth Amendment right to be free from malicious prosecution."[16] Thus, this court has acknowledged that it has "long recognized a constitutional right under the Fourth Amendment 'to be free from malicious prosecution.'"[17]

This court has further clarified that "malicious prosecution may be a constitutional violation . . . only if all of its common law elements are established."[18] Our most recent discussion of the tort of malicious prosecution held that the requirements of the state tort law and the constitutional tort are the same. In *Gordy v. Burns*, this court explained:

---

[16] *Kerr,* 171 F.3d at 339.

[17] *Izen v. Catalina*, 256 F.3d 324, 327 (5th Cir. 2001) (quoting Kerr, 171 F.3d at 339); *see also Piazza v. Mayne*, 217 F.3d 239, 245 (5th Cir. 2000) (noting that "malicious prosecution implicates rights guaranteed by the Fourth Amendment and is therefore actionable under §1983"); *Eugene v. Alief Ind. Sch. Dist*., 65 F.3d 1299, 1305 (5th Cir. 1999) (holding that this right was clearly established as early as 1972)

Defendants point out that there have been some judicial ruminations concerning what conduct is sufficient to prove a cause of action for malicious prosecution under the Fourth Amendment. *See Kerr,* 171 F.3d at 343 (Jones, E., specially concurring) (noting that "the tort of malicious prosecution fits uneasily within the Fourth Amendment" and "[t]o justify a Fourth Amendment malicious prosecution claim . . . one has to extend the period of "seizure" past arraignment").

In *Gordy v. Burns,* 294 F.3d 722, 726 (5th Cir. 2002), we made clear that in a claim for malicious prosecution there is no requirement of post-arraignment seizure. Moreover, even if this court were to require independent proof of a violation of the Fourth Amendment in addition to proof of the tort of malicious prosecution, the analysis in this case would not change as Castellano established a violation of his Fourth Amendment rights with proof that he was seized and convicted by virtue of fraudulent evidence fabricated by the defendants--one of whom was a police officer.

[18] *Izen*, 256 F.3d at 328 (citing *Evans v. Ball*, 168 F.3d 856, 862-63 n.9 (5th Cir 1999)).

14

Unquestionably, state-law tort claims – such as the common-law tort of malicious prosecution – are not, by themselves, actionable under §1983. Because § 1983 requires some showing that the plaintiff has been deprived of a federal right, but no constitutional provision specifically guarantees against the institution of groundless criminal prosecutions, a "malicious prosecution" claim under § 1983 is a misnomer.

Nevertheless, the rule in this circuit is that the elements of the state-law tort of malicious prosecution and the elements of the constitutional tort of "Fourth Amendment malicious prosecution" are coextensive. . . . the rule is rooted firmly in Fifth Circuit precedent.[19]

Furthermore, the court noted that:

[A] plaintiff in a §1983 malicious prosecution action need establish only the elements of common-law malicious prosecution. This circuit repeatedly has indicated–without explanation--that courts must look to the elements of a malicious prosecution claim under the law of the state where the offense was committed.[20]

Thus, by pleading a claim for malicious prosecution under the Fourth Amendment, a plaintiff pleads an actionable claim under § 1983. The reviewing court need only consider the elements of the tort of malicious prosecution as defined under the law of the relevant state to determine whether a plaintiff has established a claim of malicious prosecution.[21] Therefore, in the case at bar, Castellano was only required to satisfy the criteria for malicious prosecution under Texas law to successfully state a cause of action under § 1983 for a violation of his rights under the Fourth Amendment. Under Texas law, the elements for a cause of action for malicious prosecution are: (1) a criminal action commenced against the plaintiff; (2) the prosecution was caused by the defendants or with their aid; (3) the action terminated in plaintiff's favor; (4) the plaintiff was innocent; (5) the defendants acted without probable cause; (6) the defendants acted with malice; and (7) the criminal proceeding

---

[19] *Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002)(internal citations omitted).

[20] *Id.* at 726.

[21] *Piazza,* 217 F.3d at 245.

15

damaged the plaintiff.[22]

Accordingly, the trial court did not err in finding that a § 1983 claim for malicious prosecution existed under the Fourth Amendment.

## B. Sufficiency of Castellano's Complaint to Assert a Cause of Action Under the Fourth Amendment

We now turn to defendants' allegation that Castellano did not plead a cause of action for malicious prosecution under § 1983 for purposes of the Fourth Amendment. Defendants raised the identical issue in their motion for summary judgment before the trial court--wherein the court treated it as a motion to dismiss for failure to state a claim and determined that Castellano's complaint contained sufficient facts to support his allegation that his Fourth Amendment rights had been violated. We explained in *Bennett v. Pippin*,

> After a trial on the merits, the sufficiency of the allegations in the complaint is irrelevant. . . . When the plaintiff has prevailed after a full trial on the merits, a district court's denial of a Rule 12(b)(6) dismissal becomes moot. The plaintiff has proved, not merely alleged, facts sufficient to support relief.[23]

Based on the rationale in *Bennett* this court will not address this issue.

## C. Jury Instructions

Federal Rule of Civil Procedure 51 provides, "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."[24] However, this court has never held that a party's failure to object to proposed jury instructions creates a

---

[22]*Kerr*, 171 F.3d at 340.

[23] 74 F.3d 578, 585 (5th Cir. 1996).

[24] Fed. R. Civ. P. 51.

16

jurisdictional bar to appellate review and has previously entertained tardy jury instruction objections under the plain error standard of review.[25]

Furthermore, in *Tompkins v. Cyr,* this court cautioned that, "[i]n reviewing jury instructions for plain error, we are exceedingly deferential to the trial court" and reiterated the justification behind such deference:

> Few jury charges in cases of complexity will not yield "error" if pored over, long after the fact in the quiet of the library – if such an enterprise is to be allowed. It is not. The reality is that most such "errors" will be washed away if the trial court is given a fair opportunity to consider them. In short, so long as the trial judge gives counsel a fair opportunity to object, we will listen to unobjected to rulings only in those handful of cases that can meet the exacting requirements of plain error. . . . These rules vindicate powerful interests in orderliness and finality. They also reflect the central role of the United States District Court. If is not a way station or entry gate. Rather, trials are the heart of the system. Trial, not appeal, is the main event.[26]

When the party challenging the district court's instructions has not objected to them before the district court, our consideration of the issue is limited to plain error review and requires proof: "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the plain error must affect substantial rights; and (4) not correcting the error would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'"[27] Further, this court has noted that "[a]n inadequate instruction merits reversal when 'the charge as a whole leaves us with the substantial and

---

[25] *Tompkins v. Cyr*, 202 F.3d 770, 783 (5th Cir. 2000) (citing 9 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 51.21[2] and *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 931-32 (5th Cir. 1999)).

[26] *Id*. at 784 (5th Cir. 2000) (citing *Highlands Ins. Co. v. Nat'l Union Fire Ins. Co.*, 27 F.3d 1027, 1032 (5th Cir. 1994)).

[27] *Russell v. Plano Bank & Trust,* 130 F.3d 715, 721 (citing *Highlands Ins. Co.*, 27 F.3d at 1031-32) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

ineradicable doubt whether the jury has been properly guided in its deliberations.'"[28] Thus, for this court "[t]o overturn a verdict for plain error in the instructions, we must find an obviously incorrect statement of law that was 'probably responsible for an incorrect verdict, leading to substantial injustice.'"[29]

Because defendants did not object to the trial court's instructions pertaining to malicious prosecution before they were submitted to the jury, this court will review the instructions for plain error.[30] Clearly, the trial court erroneously instructed the jury that Castellano should prevail if the jury found that defendants violated Castellano's "constitutional right to due process" by maliciously prosecuting him for the criminal offense of arson. Rather, the trial court should have directed the jury that Castellano should prevail only upon a showing that defendants violated Castellano's Fourth Amendment right to be free from "unreasonable seizure." Such an instruction would have been consistent with the court's prior order holding that Castellano could maintain his cause of action for malicious prosecution only under the Fourth or First Amendments–not the Fourteenth Amendment.

[28] *Turnage v. General Electric Co.*, 953 F.2d 206, 211-12 (5th Cir. 1992) (quoting *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189 (5th Cir. 1991)); *see also Rubinstein v. Administrators of the Tulane Educational Fund,* 218 F.3d 392, 404 (5th Cir. 2000) (noting that "[e]ven if an instruction erroneously states the applicable law or provides insufficient guidance, this Court will not disturb the judgment unless the error could have affected the outcome of the trial").

[29] *Tompkins*, 202 F.3d at 784 (citing *Automotive Group v. Central Garage Inc.*, 124 F.3d 720, 730 (5th Cir. 1997)); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 126 (5th Cir. 1980) (noting that failure to object to the jury charge in the trial court precludes review on appeal "unless the error is so fundamental as to result in a miscarriage of justice").

[30] It should be noted that all counsels' proposed jury instructions were submitted prior to the trial court's dismissal of Castellano's malicious prosecution claim under the Fourteenth Amendment. Accordingly, their proposed instructions referred to Castellano's alleged "deprivation of liberty."

However, having reviewed the jury instructions as a whole, this court cannot conceive how using the words "due process," rather than "unreasonable seizure," would have changed the jury's verdict under the facts of this case. Thus, we conclude that the trial court's error was not responsible for an "incorrect verdict, leading to substantial injustice."[31]

The law of this circuit holds that in the event the elements of malicious prosecution are proved, *a fortiori*, a violation of the Fourth Amendment is also proved. In the case at bar, although the judge never mentioned the "Fourteenth Amendment" in its instructions, it erroneously used the words "due process." However, "due process" was defined as the common-law elements of malicious prosecution. Thus, during its deliberations, the jury had before it the appropriate standard required to find a violation of the Fourth Amendment. The jury applied that standard to the overwhelming evidence and found Sanchez and Fragozo liable. It is unlikely that the jury would have reached a different conclusion had the trial court used the words "unreasonable seizure" rather than "due process"–under either wording, the jury had to find that the elements of malicious prosecution were met.

Further, the record clearly shows that the parties, attorneys, court, and jury were keenly aware that if Castellano proved the elements of malicious prosecution, a constitutional right had been violated. Thus, this case hinged on the jury's interpretation of the facts and the credibility of the witnesses as applied to the correct legal standard (the common-law elements of malicious prosecution). The impetus for the jury verdict was not the improper words "due process," but whether the jury believed that Castellano was arrested, convicted, and sentenced as a result of Sanchez and

---

[31] *Tompkins*, 202 F.3d at 784 (citing *Automotive Group v. Central Garage Inc*., 124 F.3d 720, 730 (5th Cir. 1997)).

19

Fragozo's conspiracy. It is evident that the jury believed that the elements of malicious prosecution were met. The facts drove this case--not the misnomer of the constitutional provision in the jury instructions.[32]

Considering the jury instructions as a whole and applying the great deference that this court owes the trial court in reviewing jury instructions, we find that the trial court's error did not result in an incorrect verdict leading to substantial injustice.

**D. Sufficiency of Evidence of Malicious Prosecution under the Fourth Amendment**

On appeal, defendants contend that there was insufficient evidence to support several of the elements of malicious prosecution.[33] The only element preserved by defendants in their pre-verdict JMOL motions, however, was the lack of "probable cause." This court has repeatedly explained that to assert a claim in a Rule 50(b) motion, a party must have raised the issue at the close of the evidence

---

[32] Moreover, the jury instruction was not fatally flawed even if proof of illegal seizure were required. *See infra* note 33.

[33] Although it was unnecessary for Castellano to prove that he was "seized" pursuant to the Fourth Amendment to prevail in his § 1983 claim, it is pellucid that Castellano would easily satisfy that requirement because the jury found that he was arrested, convicted, and sentenced on the basis of fraudulent evidence.

Further, the record contains sufficient evidence that Castellano's seizure was "unreasonable." For example, at trial, Castro admitted that "probable cause" to arrest Castellano was established when he received evidence implicating Castellano in the arson including: (1) the audio tape which, while not known to Castro, had been produced and altered by Fragozo and Sanchez and (2) Sanchez's statement concerning the fire. Under federal law, an "otherwise illegal arrest cannot be insulated from challenge by a decision of the instigating officer to rely on fellow officers to make the arrest." *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971). Thus, the fact that (1) Fragozo, a police officer, knew that the audio tape and portions of Sanchez's statement to Castro implicating Castellano in the arson was fraudulent and (2) Castro relied on such fraudulent evidence in establishing probable cause against Castellano, satisfies the "some evidence" standard that Castellano's arrest was unreasonable.

20

in a Rule 50(a) motion.[34] When a party fails to comply with the Rule 50 procedural requirements, this court employs the "some evidence" standard of review.[35] Therefore, we need only determine whether there was *any* evidence presented at trial as proof of each of the other five elements of malicious prosecution.[36] Based on our review of the record, there is at least some evidence proving each of those elements.

As noted above, because Sanchez preserved her challenge concerning the existence of "probable cause," this court will review the record to determine whether a reasonable jury could have arrived at the same conclusion the jury rendered.[37]

In the case at bar, the jury was presented with the following evidence: (1) testimony from Joe Hebert that the audio tape Castro received from Sanchez and Fragozo was fabricated, (2) Castellano's unwavering assertion that he was innocent, and (3) Cantu's testimony that Fragozo tried to intimidate

---

[34] *See, e.g., U.S. v. Flintco Inc.*, 143 F.3d 955, 960 (5th Cir. 1998); *see also Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1315 (5th Cir. 1995) (explaining that the dual purposes of Rule 50 are: (1) allowing the trial court to re-examine the sufficiency of the evidence as a matter of law if, after verdict, the court must address a motion for judgment as a matter of law and (2) alerting the opposing party to the possible insufficient of his case before being submitted to the jury so that he/she has the opportunity to cure any defects in proof should the motion have merit); *MacArthur v. University of Texas Health Center, at Tyler*, 45 F.3d 890, 897 (5th Cir. 1995).

[35] *Polanco v. City of Austin, Tx.*, 78 F.3d 968, 974 (5th Cir. 1996).

[36] This court will discuss the "damages" element *infra.*

[37] *Powers v. Vista Chemical Co.*, 109 F.3d 1089, 1093 (5th Cir. 1997) (citing *Polanco,* 78 F.3d at 974); *Thrash v. State Farm Fire & Casualty Co.*, 992 F.2d 1354, 1356 (5th Cir. 1993) (explaining that "[w]e will reject a verdict in those instances when, 'despite considering all the evidence in the light and with all reasonable inferences' most favorable to the verdict, we find no evidence of 'such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion' could arrive at the same conclusion") (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 176 (5th Cir. 1985).

21

him into altering his original story to the police in order to implicate Castellano in the arson.  There was sufficient evidence for a reasonable jury to find that Sanchez and Fragozo acted without probable cause.  It would be an abuse of this court's discretion to hold otherwise.

**E. Evidence of a Conspiracy between Sanchez and Fragozo**

Defendants posit that there was insufficient evidence of a conspiracy to inculpate Sanchez, –who is not a § 1983 state actor. Because Sanchez properly preserved this issue in a pre-verdict JMOL, the court will review the record  to consider whether a reasonable jury could have found that a conspiracy existed.

The elements of civil conspiracy are: (1) an actual violation of a right protected under § 1983, and (2) actions taken in concert by defendants with the specific intent to violate that right.[38]  Further, for Sanchez to be liable under § 1983, there had to be proof that she conspired with Fragozo, who was acting under color of law, to violate Castellano's Fourth Amendment rights.[39]

On this issue, the jury was presented with evidence that (1) Fragozo, as police officer, provided the tape recorder so that Sanchez could record her conversations with Castellano; (2) the tape was subsequently altered;  (3)  upon Fragozo's prompting, Sanchez turned the tape over to Castro; and (4)  Sanchez and Fragozo attempted to get Jiminez on "their side" to support their story that Castellano had intentionally burned Fred's No. 7. Having concluded that Castellano's Fourth Amendment rights were violated, we similarly conclude that there was sufficient evidence before the jury for it to find that a conspiracy existed between Sanchez and Fragozo to deprive Castellano of

---

[38] *See Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir. 1994).

[39]*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("[t]o act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents") (citation omitted).

those rights.

**F. Qualified Immunity**

In his JMOL motions at the close of Castellano's case and at the close of all the evidence, Fragozo argued that there was insufficient evidence to support the jury's finding that, for purposes of qualified immunity, his actions were not objectively reasonable. However, Fragozo did not raise this issue in his post-verdict motion. Thus, the standard of review to be applied on appeal, whether it be plain error or abuse of discretion, is uncertain. For example in *Gaia Techs., Inc. v. Recycled Prods. Corp.*, we explained that "[w]e have never required a party to file a [post-verdict] Rule 50(b) motion in order to preserve its right to claim insufficiency of the evidence on appeal, so long as it has filed a Rule 50(a) motion at the close of all the evidence."[40] However, in *Colonial Penn. Insur. v. Market Planners Insur. Agency, Inc.*, we held that "[i]n a jury trial, of course, a party must make (and renew at the trial's conclusion) a [post-verdict] a Rule 50(a) [JMOL] motion . . . in order to preserve sufficiency of the evidence for appellate review."[41]

Having reviewed the record, however, this court is satisfied that under either standard there was sufficient evidence for the jury to find that Fragozo's actions were objectively unreasonable for purposes of qualified immunity.

If the trial court does not resolve the issue of qualified immunity before trial because facts about the official conduct are in dispute, it may be decided by the jury.[42] Thus, in determining whether an individual is entitled to qualified immunity, the jury must determine whether: (1) plaintiff alleged

---

[40] 175 F.3d 365, 374 n.9 (5th Cir. 1999).

[41] 157 F.3d 1032, 1036 n.3 (5th Cir. 1998).

[42] *Snyder v. Trepagnier*, 142 F.3d 791, 799-800 (5th Cir. 1998).

23

a violation of a clearly established constitutional right[43] and (2) the official's conduct was objectively unreasonable under clearly established law existing at the time of the incident.[44]

In the case at bar, Castellano alleged a violation of his Fourth Amendment right to be free from malicious prosecution. At the time of the events at issue, the protection afforded by the Fourth Amendment to be free from unreasonable seizure was sufficiently clear so that a reasonable official would understand what he [Fragozo] was doing violate[d] the that right.[45] Thus, any reasonable officer would have known that Fragozo's actions in (1) encouraging a witness to fabricate evidence and turn it over to an investigating officer and (2) intimidating another witness, for the purpose of creating probable cause to arrest an innocent individual, were unlawful. Given the above, the jury's determination that Fragozo acted unreasonably, and thereby was not entitled to qualified immunity, is supported by sufficient evidence.

## G. Damages

Having found the defendants liable, the jury awarded Castellano $3,000,000 in compensatory damages and $500,000 in punitive damages. We now turn our consideration to defendants' objections to the damage award.

### 1. Castellano's Mental Anguish Damages

In *Patterson v. P.H.P. Healthcare Co.*,[46] this court explained that in the context of a Title VII

---

[43] *Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001).

[44] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[45] *Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 260 (5th Cir. 1984); *Reeves v. City of Jackson*, 608 F.2d 644, 650 (5th Cir. 1979).

[46] 90 F.3d 927 (5th Cir. 1996).

24

case, a plaintiff's testimony that he felt "frustrated" and "real bad" for being judged by the color of his skin and that his work environment was "unbearable" was insufficient to support anything more than a nominal damage award for emotional harm, absent corroborating testimony or expert medical or psychological evidence of damages caused by the alleged distress. This court has held that the testimony of a plaintiff, alone, can be sufficient to support an award of mental damages when it is particularized and extensive.[47] However, because neither defendant raised this issue in their Rule 50(a) motion, the court refused to "consider the issue" in the post verdict motions.

On appeal, defendants contend that the trial court abused its discretion in denying their motion for judgment as a matter of law or, in the alternative, a new trial as to Castellano's mental anguish damage award because there was insufficient evidence on which the jury could base such an award under *Patterson* and its progeny.

As alluded to above, the standard of review employed to analyze a trial court's denial of a judgment as a matter of law depends on whether the party complied with Rule 50(a).[48] When a party has properly moved for judgment as a matter of law at the conclusion of the evidence, this court

---

[47] *See e.g., Oden v. Oktibbeha County Mississippi*, 246 F.3d 458, 470-71 (5th Cir. 2001) (upholding jury award of $20,000 in compensatory damages for mental anguish when the only evidence submitted by plaintiff was his own testimony that as a result of defendants' discrimination, he experienced stress, sleeplessness, betrayal, and shame); *Williams v. Trader Pub. Co.*, 218 F.3d 481, 486-87 (5th Cir. 2000) (upholding an award of $100,000 in compensatory damages for emotional distress premised solely on Williams' testimony regarding her "severe emotional distress," sleep loss," severe loss of weight" and "beginning smoking"); *Forsyth v. City of Dallas,* 91 F.3d 769 (5th Cir. 1996) (upholding jury verdict awarding two plaintiffs $100,000 and $75,000 respectively in emotional anguish damages based on their testimony that they suffered weight loss, depression, intestinal troubles, marital problems, and sleeplessness after they were demoted within the police force for making allegations of illegal wiretapping within the police department).

[48]*Polanco,* 78 F.3d at 973-74.

reviews the record to determine the sufficiency of the evidence.[49] However, when a party has not properly moved for a judgment as a matter of law, this court reviews the record only to determine whether the record contains *any* evidence to support the trial judge's decision.[50]

This court has never demanded a "slavish" adherence to the Rule 50 "procedural sequence." However, in cases in which we have strayed from its proscriptions, the divergence has been "de minimus" and the purposes of the rule, enabling the trial court to re-examine the sufficiency of the evidence as a matter of law and alerting the opposing party to the insufficiency of his case before being submitted to the jury, were accomplished.[51]

The facts of this case do not warrant an exception to Rule 50. Neither the trial court nor opposing counsel had any indication that defendants intended to challenge Castellano's account of his mental anguish damages because they raised no objection during Castellano's testimony, voiced no concern as to the sufficiency of the evidence during the jury charge, and did not mention this argument at the close of the case. Thus, we will review the record to determine whether there is *any* evidence of mental anguish to support the jury's damage award.

Having reviewed the record, the court is satisfied that there is some evidence of Castellano's

---

[49]*Id*. at 974 (noting that "[t]he standard for evaluating the sufficiency of evidence is whether the evidence has such quality that reasonable and fair-minded persons would reach the same conclusion").

[50] *Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1133 (5th Cir. 1997) (noting that "we must keep in mind 'this court's longstanding rule that reversal for plain error is 'not a run-of-the-mill remedy' and will occur only in exceptional circumstances to avoid a miscarriage of justice'") (quoting *Highlands*, 27 F.3d at 1032).

[51] See for example the court's reasoning in *U.S. v. Flintco*, 143 F.3d 955 (5th Cir. 1998) (refusing to exempt party from Rule 50 because defendant did not move for judgment as a matter of law at close of plaintiff's case or at the close of all the evidence and did not challenge sufficiency of evidence as a basis for objecting to the court's jury instruction).

mental anguish damages and will not disturb the jury verdict. During the trial, the jury learned that Castellano has dealt, for fifteen years, with the stigma of being convicted of an arson he did not commit in a community where he was once a prominent citizen. Castellano explained that since his conviction, his reputation has been ruined:[52]

> People–in a situation like this, people don't forget, and they still think you're guilty, even though you're not. You can explain to them all you want that it's been expunged, I'm not guilty, it was a frame up. Tell them everything you want. But they still have it in their mind that you may be guilty.[53]

Further, Castellano stated that he was required to resign from his civil service position after his arrest-- and was not reinstated after his record was expunged. He also explained that since his conviction, he has been unable to obtain fire insurance or financing for his business.

Castellano also described the details of his arrest and stated after he was taken from his business, he was forced to remain in handcuffs at the police station for a little over an hour at which point he heard Castro ask another officer whether "[l]os animales ya legaron"(have the animals arrived).[54] He stated that by "animales" Castro was referring to the press and explained that he was held in a back room until the press arrived. Thereafter, Castellano was paraded slowly before the press–in handcuffs. According to Castellano, the details of his case were intermittently reported as

---

[52] *See Marreo v. City of Hialeah*, 625 F.2d 499, 514 & n.19 (5th Cir. 1980) (holding that "to the extent unconstitutional conduct caused injury to appellants' personal or business reputations, the injury is compensable as an element of damages" and explaining that "[s]ince the fourth amendment protects some of our most cherished rights, and the injury to reputation flowing from the violation of those rights may be devastating, we have no doubt that a principle of fair compensation requires that injury to reputation caused by a violation of fourth amendment rights be compensable").

[53] Tr. at 223.

[54] Tr. at 212.

27

the lead story on the front page of the newspaper for over a year.

Castellano's testimony was particularized, extensive, and compelling. Thus, under the plain error standard, the existence of evidence of Castellano's mental anguish constrains this court from reversing the decision of the trial court.[55]

**2. Trial Court's Decision to Allow the Jury to Compensate Castellano's Personal Damages Derivative from Damages Sustained by his Corporation**

This court reviews a trial court's evidentiary rulings for an abuse of discretion.[56]

Defendants first contend that under Federal Rule of Civil Procedure 9(g), Castellano's request for damages to compensate his individual losses derivative from his business, including lost wages in the form of executive compensation, should have been pled with specificity as a form of "special damages."[57] Further, they argue that through his complaint Castellano only requested damages to compensate the corporation for its losses stemming from its inability to franchise–*not* for damages Castellano allegedly suffered *personally*. Thus, defendants urge this court to find that the trial court abused its discretion by overruling their objections to the jury's consideration of such damages.

The Federal Rules of Civil Procedure require notice pleading[58] and defendants cite no Fifth

---

[55] The court also notes that the jury heard testimony that the damages Castellano personally suffered as a result of damages to his business were approximately $1,200,000. Therefore, we assume that the $3,000,000 compensatory damage award included Castellano's personal economic losses.

[56] *In re Air Crash Disaster*, 795 F.2d 1230, 1232 (5th Cir. 1986).

[57] Defendants cite no Fifth Circuit law in support of this contention and instead rely on jurisprudence from the Seventh and Eighth Circuits.

[58] *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000); 5 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE, §1216 at 151-52 (citing *Continental Colleiries, Inc. v. Shober*, 130 F.2d 631, 635 (3rd Cir. 1942)) (noting that under Federal Rule of Civil Procedure 8, a complaint is required to afford "fair notice to the adversary

28

Circuit jurisprudence to support their position that loss of earning potential must be pled with specificity. Castellano's third amended complaint prayed for damages, in part, to compensate him for any impairment to his social and mercantile standing–which arguably includes the loss of earning potential. Defendants were also aware that after his arson conviction Castellano was unable to franchise his restaurant and, under the notice pleading standard, defendants should have been aware that, as the sole owner of the restaurant, Castellano would seek any damages he suffered derivative from his business losses. Additionally, these losses were mentioned in Castellano's expert report. We find defendants' argument that they were unaware that Castellano would be seeking damages to compensate his personal loss stemming from the economic damage to his corporation to be unpersuasive. Thus, we conclude that the trial court did not abuse its discretion in admitting evidence of Castellano's lost wages in the form of executive compensation.

### 3. Notice of Trevino's Testimony as to Castellano's Individual Damages

This court employs an abuse of discretion standard when reviewing a trial court's decision on the admissibility of expert testimony.[59]

Defendants argued at trial that they were unaware that there would be expert testimony as to Castellano's individual damages derivative from his inability to franchise his business--including lost wages in the form of executive compensation. The trial court disagreed and allowed Trevino to testify as to "the damages Castellano sustained personally as a result of this malicious prosecution, such as loss of income to him as a result of being unable to franchise Fred's Fish Fry."

---

of the nature and basis of the claim asserted and a general indication of the type of litigation involved").

[59] *Jon-T Chems., Inc. v. Freeport Chem. Co.,* 704 F.2d 1412, 1417 (5th Cir. 1983).

However, defendants knew that Trevino would be called as an expert witness for Castellano because he was identified as such in all pre-trial material. Further, in the report prepared before trial and served on defendants, Trevino specifically addressed the economic damages sustained by Castellano, including his lost executive compensation. Had defendants opted to depose Trevino before trial, they could have thoroughly explored the details of his report. Thus, the trial court did not abuse its discretion in determining that, because estimates of Castellano's future compensation were included in his expert report, defendants were not unfairly surprised by Trevino's testimony as to Castellano's personal damages derivative from the failure to franchise Fred's.

**4. Speculative Testimony**

It is defendants' position that the trial court also erred in admitting Trevino's testimony as to Castellano's individual damages, including the loss of executive compensation, because it was purely speculative and premised on the assumption that Castellano's franchise would have been profitable.

While we have held that "[d]amages will not be awarded for lost profits that are merely speculative in nature," we have tempered that rule explaining that, " it is not necessary that recovery for future profits should be established by exact calculation, as it is enough to have data from which these profits may be ascertained with a reasonable degree of certainty and exactness."[60]

Having reviewed the record, this court finds that Trevino's testimony as to Castellano's

---

[60] *DSC Communications Corp. v. Next Level Communications,* 107 F.3d 322, 329 (5th Cir. 1997) (quoting *Fiberlok, Inc. v. LMS Enter.*, 976 F.2d 958, 962 (5th Cir. 1992) (internal citations omitted); *Hiller v. Mfrs. Prod. Research Group of North America,* 59 F.3d 1514, 1520 (5th Cir. 1995) (quoting the Texas Supreme Court for the proposition that "[t]he requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise. . .[w]hether in a given case they should be so classified depends altogether upon the facts and circumstances of that particular case").

individual damages was not speculative. Rather, Trevino formed and presented a competent opinion regarding Castellano's individual lost profits, after the fire, with reasonable certainty by relying on his review of objective historical data, including: (1) Fred's past economic figures and success as a restaurant before the fire, (2) the successes of other similar restaurants, and (3) other reference sources. Based on the above, this court concurs with the trial court's determination that "Trevino was able to ascertain a competent opinion regarding lost profits with reasonable certainty and without speculation."

### 5. Punitive Damage Award

In reviewing an award of punitive damages, the focus of the reviewing court is to ensure that, under the circumstances of the case in question, the award is not grossly excessive or unreasonable.[61] To make that determination, the court should consider the following factors: (1) the degree of defendant's reprehensibility or culpability, (2) the ratio between the compensatory and punitive damages;[62] and (3) the possible criminal and civil sanctions for comparable misconduct.[63]

In the case at bar, the jury found that defendants conspired to have Castellano falsely charged and convicted of arson--an insidious crime that loomed over him for years--by fabricating evidence. Such conduct is pusillanimous and unquestionably reprehensible. Further, considering the

---

[61] *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382 (5th Cir. 1991).

[62] *BMW of North America v. Gore*, 517 U.S. 559, 580 (1996) (explaining that the proper inquiry is whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred).

[63] *Cooper Indus. Inc. v. Leatherman Tool Group Inc.*, 532 U.S. 424, 435 (2001)*; BMW* 517 U.S. at 575; *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 20-21 (1991) (noting that "appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition"); *Eichenseer,* 934 F.2d at 1382.

emotional and monetary harm Castellano suffered and will continue to endure through his life, the court finds that there is a reasonable relationship between the punitive damage award and the harm caused by defendants' conduct. Finally, under Texas law, tampering with or fabricating physical evidence constitutes a third degree felony.[64] Therefore, the criminal and civil sanctions that could be imposed for comparable misconduct under state law are considerable and lead this court to conclude that the punitive damage award was not excessive.

### 6. Loss of Capacity for Enjoyment of Life and Global Damages Verdict Form

Defendants cite *Dugas v. Kansas City Southern. Ry. Lines*[65] for their position that the trial court erred in allowing the jury to consider "loss of enjoyment of life" as an element of Castellano's damages. In *Dugas*, this court held that in a case involving the Federal Employer's Liability Act, the trial court had erroneously instructed the jury as to damages because it had *repeatedly* stressed "loss of enjoyment of life" and "loss of vitality" as if they were separate and independent items of damages. However, in the case at bar, the trial court correctly explained that the jury was to consider "loss of enjoyment of life" as one of several factors in determining an appropriate compensatory damage award for Castellano. Accordingly, it was not an abuse of discretion for the trial court to deny defendants' motion for a new trial on this issue.

Defendants rely on this court's holding in *In re Air Crash Disaster*[66] for their argument that the trial court erred in submitting a global damage jury verdict form. Defendants argument is misguided and the rationale employed in *In re Air Crash Disaster* is distinguishable from the case at bar. In that case,

---

[64] Tex. Penal Code § 37.09

[65] 473 F.2d 821, 827 (5th Cir. 1973).

[66] 795 F.2d 1230 (5th Cir. 1986).

32

we held that the use of a global rather than specific interrogatories on the issue of damages in a wrongful death action required a new trial on the element of damages comprising the general award once it was determined that the total award exceeded the maximum recovery rule. In this case, however, there is no basis for this court to remit the damage award and because the amount awarded does implicate the maximum recovery rule, the trial court's global damages interrogatory was not in error.[67]

### 7. *Attorneys Fees Under § 1983 and § 1988*

Defendants contend that the trial court erred in awarding Castellano criminal defense attorneys' fees accrued during his criminal trial because 42 U.S.C. § 1988(b) only permits the recovery of attorney fees in "actions or proceedings to enforce the provisions of § 1983."

While this court has yet to rule upon this issue, several circuits have reasoned that a plaintiff who is successful in a malicious prosecution claim should be reimbursed for the attorney's fees expended during the original criminal proceeding. In *Kerr v. City of Chicago*, the court reasoned:

> The defendants also contend that attorneys' fees expended in a criminal action are not recoverable in a civil rights action. We disagree. In *Batisita v. Weir*, 340 F.2d 74, 85-86 (3d Cir. 1965), the court held that federal common law controls the question of damages in civil rights actions with the purpose being to vindicate the civil rights of the individual. A plaintiff in a civil rights action should be allowed to recover the attorneys' fees in a state criminal action where the expenditure is a *foreseeable result* of the acts of the defendant.[68]

Similarly, in *Borunda v. Richmond,*[69] the Ninth Circuit held that plaintiffs in a § 1983 civil rights

---

[67] We also note that under Federal Rule of Civil Procedure 49(b), the trial court is given the discretion to submit a general verdict form.

[68] 424 F.2d 1134, 1141 (7th Cir. 1970).

[69] 885 F.2d 1384, 1389-91(9th Cir. 1989).

suit, brought after they were wrongly arrested in violation of the Fourth Amendment, were entitled to

recover attorneys' fees incurred in their defense of state court criminal charges. The court explained:

> Here, the attorneys' fees arose out of the necessity of defending against allegedly
> unwarranted criminal charges and were presented to the trier of fact as an item of
> damage.
>
> A plaintiff who establishes liability for deprivations of constitutional rights actionable
> under 42 U.S.C.§ 1983 is entitled to recover compensatory damages for all injuries
> suffered as a consequence of those deprivations. . . . The victim of the constitutional
> deprivation is entitled to compensation for economic harm, pain and suffering, and
> mental and emotional distress that results from the violations.
>
> The [plaintiffs'] expenditures for legal representation during the prior criminal
> proceeding most assuredly constitute economic harm. The reasonable amount of these
> expenditures, if proved to the jury's satisfaction to be the consequence of appellants'
> illegal conduct, is recoverable as compensatory damages.
>
> The amount of attorney's fees incurred during the criminal prosecutions was a direct
> and foreseeable consequence of appellants unlawful conduct.[70]

Finally, in *Greer v. Holt,* the Sixth Circuit declined to award attorneys' fees incurred in an

underlying prosecution where the plaintiff sued police under § 1983, *but* clarified that it, "express[ed]

no opinion as to whether the client could recover attorneys' fees as part of a damage package as, for

example, in a malicious prosecution suit."[71]

The plain language of § 1988 allows a prevailing plaintiff to recover costs expended to enforce

the provisions of § 1983[72] and such a recovery is warranted in this case. Castellano was the "prevailing

---

[70] *Id*. at 1389-90.

[71] 718 F.2d 206, 207, n.1 (6th Cir. 1983).

[72] *Raley v. Fraser*, 747 F.2d 287, 290 (5th Cir. 1984) (noting that the language of §1988
unambiguously provides that in an action to enforce § 1983, the court, "in its discretion, may
allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the
costs") (quoting 42 U.S.C. § 1988).

plaintiff" and successfully proved that defendants conspired to violate his Fourth Amendment rights. Furthermore, in order to satisfy the elements of malicious prosecution in his § 1983 action, Castellano *had* to prevail in his underlying criminal proceeding. Thus, his attorneys' fees were expended as a necessary prerequisite of his action to "enforce" the protections of § 1983.

Further, and adopting the rationale of *Kerr* and *Borunda*, Castellano's expenditure of attorneys' fees to defend himself in his criminal trial was, *unquestionably,* a foreseeable result of defendants' actions. Had defendants not conspired to fabricate evidence to implicate Castellano in the arson, in violation of his Fourth Amendment rights, he would not have been arrested and prosecuted for the crime. Thus, this court holds that the trial court did not abuse its discretion in allowing Castellano to recover the attorneys' fees he incurred during his criminal trial.

### 8. Testimony of Castellano's Criminal Defense Attorney

Defendants contend that the trial court erred in allowing Castellano's criminal defense attorney to testify as to his fees from a ledger, which had not been disclosed to them, because he could not recall the specific fees charged therein. On that basis, defendants argue that the damage award should be reversed and remanded for a new trial on damages.

This court reviews evidentiary rulings made over a party's objections for abuse of discretion and harmless error.[73] At trial, Castellano's attorney pointed out that Castellano's claim for attorney fees expended during his criminal trial was no surprise to defendants because it was listed as an element of damages in each pre-trial order prepared for trial. It is a well-settled rule that a joint pre-trial order,

---

[73] *Tompkins,* 202 F.3d at 779.

signed by both parties, governs the issues and evidence presented at trial.[74] Thus, defendants were on

notice that Castellano was seeking attorneys' fees from his criminal trial and the trial court did not

abuse his discretion in allowing the criminal defense attorney to refresh his recollection as to the exact

amount of those fees.[75]

For all these reasons, we affirm the judgment of the trial court.

AFFIRMED.

---

[74]*Branch-Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir. 1991); *Hall v. State Farm & Cas. Co.*, 937 F.2d 210, 212 (5th Cir. 1991); *Flannery v. Carroll,* 676 F.2d 126, 129 (5th Cir. 1982).

[75] *See* Fed. R. Evid. 803(5).

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting:

As stated recently in *Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002) (emphasis added): "It would be an understatement to say that [our] circuit's caselaw regarding *so-called* 'Fourth Amendment malicious prosecution' claims under § 1983 is both *confused and confusing*". (Emphasis added.) As evidenced by the majority opinion in this case, the confusion continues to expand. It is past time to correct our course.

Therefore, I must respectfully dissent from the majority's holding that, in order to state a claim under § 1983 for a violation of his rights under the Fourth Amendment for malicious prosecution, Castellano was only required to satisfy the criteria for malicious prosecution under Texas law (§ 1983 malicious prosecution claim). In addition, notwithstanding the confused state of our circuit precedent in this area, I also must respectfully dissent from the majority's holding that the district court did not commit reversible error when, for Castellano's § 1983 malicious prosecution claim, it instructed the jury on the basis of Fourteenth Amendment "due process", rather than Fourth Amendment "unreasonable seizure", especially in the light of its having previously held the Fourth, not the Fourteenth, Amendment was the constitutional basis for Castellano's pursuing the claim. Therefore, I do not reach the issues concerning sufficiency of the evidence, damages, and attorney's fees.

For the reasons stated in *Gordy* and discussed at length *infra*, en banc review is required to clarify § 1983 malicious prosecution claims in this circuit. I urge such review; further, I would vacate the judgment and remand for further proceedings.

## I.

For purposes of the issues addressed in this dissent, a statement of the relevant underlying facts and district court rulings is necessary.

Castellano owns Fred's Fish Fry (Fred's), a fast-food restaurant chain in San Antonio, Texas. Sanchez was the Fred's area manager at the time of the incident giving rise to this case: a fire on 31 October 1984 that destroyed Fred's Store Number 7 (No. 7). Sanchez was fired two days after the fire.

Fragozo, a San Antonio police officer, held an off-duty job as a Fred's security guard for approximately one year, ending in the spring of 1984, prior to the October fire. According to Castellano, Fragozo quit his Fred's job after Castellano, then Chairman of San Antonio's Fire and Police Civil Service Commission, refused to provide Fragozo a copy of the police department's examination for promotion to lieutenant.

Castellano denied ever expressing an intent to burn No. 7. Sanchez testified that he did. According to Sanchez: on or about 19 October 1984, Castellano began talking about intentionally burning No. 7; he first mentioned such a plan in response to Sanchez's noting how slow business had been at No. 7; Castellano indicated he could collect $85,000 in insurance proceeds (he had recently increased No. 7's coverage from approximately $50,000 to $85,000); on several other occasions between 19 and 26 October, Castellano spoke about the scheme, indicating he might execute it on 29 or 31 October; and he even elicited Sanchez's help, by instructing her to tell employees, every time she visited No. 7, that she smelled gas.

Sanchez relayed the content of the alleged conversations to Fragozo. In response, he gave Sanchez a voice-activated tape recorder he had purchased, so that Sanchez might tape any additional telephone conversations concerning a fire in No. 7. Fragozo and Sanchez testified that the purpose of

38

recording such conversations was to protect Sanchez from any liability if arson were attempted.

On or about 29 October, an issue arose concerning missing deposits in the bank account for Fred's. Castellano confronted Sanchez about the discrepancy and requested that she undergo a polygraph test. Sanchez refused.

Also on 29 October (according to Sanchez), Castellano instructed her to purchase Halloween items for the restaurants. Sanchez testified Castellano specifically wanted a candle in No 7. That evening, Sanchez began recording telephone conversations with Castellano. She made recordings on 29 and 30 October. While the recordings are occasionally unintelligible or pick up only one end of the conversations, they contain potentially inculpatory statements by a voice alleged to be Castellano's. Among other topics, the statements regard fire insurance and stoves being left on in No. 7. According to Sanchez, one of the 30 October recordings included an admission by Castellano of a failed arson attempt on the evening of 29 October.

The recordings, however, contain no outright admissions. And, at trial, Castellano denied the voice at various spots on the recordings was his. Additionally, an expert witness for Castellano testified as to numerous junctures and inconsistencies on the tapes.

Sanchez testified about another admission by Castellano, made in person on 31 October, about a second failed attempt on 30 October. But, Castellano denied ever attempting arson or admitting to any such attempt.

On the evening of 31 October, No. 7 was destroyed by fire. Alfred Castro, a San Antonio arson investigator (and former defendant in this action), was assigned to investigate the fire that night. After surveying the scene, but before he knew who owned the building, Castro concluded the fire resulted from arson. Physical evidence included jars of gasoline, a disconnected natural gas line from No. 7's

39

water heater, and two wrenches.

Castro met Castellano at the scene during the early hours of 1 November and learned he was the owner. Castro asked Castellano whether the building was insured. According to Castro, Castellano indicated he was not certain but then stated he believed it was insured for $55,000. When Castro left the scene that morning, he had also concluded the fire was an *inside* arson job. At that point, however, he had no information to link Castellano to the fire.

Later on the morning of 1 November, Sanchez went to the fire scene. According to Sanchez: Castro had called her earlier and informed her No. 7 had burned down "with four gallons of gasoline"; while at the scene, she was paged and told to meet Castellano about a block away; she did so; and Castellano instructed her to tell No. 7's manager that, if the police "ask[ed] [the manager] about the steel bar in the back door of the building, just for her to say that she don't [sic] remember if she left it on [the door] or not the night before".

Sanchez returned to the scene. Castro also did so that morning, where he interviewed Sanchez for the first time. She provided him the names of all employees at No. 7.

Among the employees interviewed was Luis Cantu, a longtime friend of Fragozo and longtime employee of Castellano. Cantu would later testify about an incident occurring shortly *after* the fire: Fragozo and Castro drove to his house; brought him to Fragozo's car; and attempted to persuade him — allegedly while intimidating him with a weapon — to alter a statement he had provided to authorities concerning the fire.

On or about 2 November, Fragozo contacted Lieutenant Trevino of San Antonio's Arson Department, informing him of an anonymous witness with information about two previous attempts to burn No. 7. Castro met with Fragozo on 6 November. Fragozo confirmed there was an informant,

40

and stated he would try to persuade the informant to come forward. The next day, Castro and Fragozo met again; Fragozo revealed Sanchez's identity and the recorded conversations.

That afternoon (7 November), Castro met with Sanchez, who had been fired by Castellano on 2 November. (According to Castellano, she was fired for her earlier referenced refusal to submit to the polygraph test regarding the missing deposits.) Sanchez, who had been prompted several times by Fragozo to release the recorded conversations, provided the tape to Castro and agreed to make a written statement that evening. In it, she discussed, among other things, her telephone conversations with Castellano and his alleged prior arson attempts.

After taking the statement from Sanchez, Castro concluded he had probable cause to believe Castellano was responsible for the fire. With the evidence he had gathered, Castro contacted the District Attorney, who prepared an affidavit. Both the District Attorney and Castro signed it; and Castro presented it to a magistrate, who issued an arrest warrant.

Castro executed the warrant at Castellano's office. Castro and a partner escorted Castellano to their patrol car, searched him, and took him to the police station. There, Castro booked and fingerprinted Castellano, before escorting him to the jail. Castellano was apparently released on bail shortly thereafter. The entire episode lasted a few hours.

An examining trial was held, at which Castro and Sanchez, but not Fragozo, testified. The judge found probable cause. The case was then presented to a grand jury, which indicted Castellano.

Castellano was convicted in Texas state court of arson and sentenced to five years probation. But, on his third state habeas application, the Texas Court of Criminal Appeals set aside the conviction and remanded to the trial court. *Ex Parte Castellano*, 863 S.W.2d 476 (Tex. Crim. App. 1993).

Apart from Castellano, the only witness at the habeas hearing had been one of his employees,

Clemencia Jiminez, who testified that: Sanchez had told her of a plan to falsely accuse Castellano; and Sanchez and Fragozo had attempted to enlist her in that plan. In setting aside the conviction, the Court of Criminal Appeals accepted the habeas judge's factual finding that Fragozo and Sanchez had perjured themselves during the criminal trial. *E.g., id.* at 481.

Subsequently, the District Attorney's office dismissed the case. In this § 1983 malicious prosecution action that followed, the district court took judicial notice of the criminal case having been "dismissed for lack of sufficient evidence". On the other hand, it granted a motion *in limine*, prohibiting reference to specific findings about Castellano's habeas relief.

In 1994, Castellano filed this action in Texas state court as a common-law tort action. In addition to Fragozo, Sanchez, and Castro, Castellano sued others, including the City of San Antonio. After § 1983 claims were added in early 1996, this action was removed to federal court. Castellano filed a second amended complaint; *the district court interpreted it as premised entirely on a claim under § 1983 for malicious prosecution (§ 1983 malicious prosecution claim) and ruled the action would proceed solely on that basis*. Castellano filed a third amended complaint in late 1996.

The action was referred to a magistrate judge in early 1998. At that time, the only remaining defendants were Fragozo, Sanchez, Castro, and the City. Sanchez promptly moved for summary judgment, contending, *inter alia*: that Castellano presented a § 1983 malicious prosecution claim premised solely on Fourteenth Amendment substantive due process violations, but that ***Albright v. Oliver***, 510 U.S. 266 (1994), discussed extensively *infra*, had limited the availability of the claim to Fourth Amendment violations. (Of course, the Fourth Amendment is made applicable to state actors through the Fourteenth Amendment. References, however, in this dissent to the Fourteenth Amendment are to substantive due process.)

42

Sanchez's summary judgment motion was granted in part and denied in part, the court ruling: *Castellano could not base his claim on the Fourteenth Amendment*; Castellano had based his claim, in part, on the Fourth Amendment, the constitutional basis for a § 1983 malicious prosecution claim; and his third amended complaint contained allegations supporting a Fourth Amendment violation. Tr was held more than two years later, in April 2000. At the close of Castellano's evidence, defendants moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law (JMOL), asserting, *inter alia*: there is no basis, as a matter of law, for a § 1983 malicious prosecution claim; and, alternatively, *as the district court had held in its summary judgment ruling*, the claim exists only for Fourth Amendment violations and, consequently, Castellano's claim could survive only to the point of arrest. The district court denied the JMOL motions by Fragozo, Sanchez, and Castro but granted that by the City, finding no evidence of a municipal policy or custom.

Fragozo, Sanchez, and Castro, the three remaining defendants, renewed their JMOL motions at the close of all the evidence. The motions were again denied.

As discussed *infra*, the magistrate judge instructed the jury not in terms of a Fourth Amendment violation, but in terms of a "constitutional right to due process". He instructed that, to hold the defendants liable, the jury had to find, *inter alia*, that they had "intentionally committed acts that deprived [Castellano] of due process". (It was stipulated that, as required for § 1983 liability, Fragozo and Castro had acted under "color of state law".)

In answers to interrogatories, the jury found: Fragozo, *but not Castro*, while acting under color of law, "deprived Castellano of his *constitutional rights* by committing malicious prosecution" (emphasis added); and Sanchez conspired with Fragozo, while he was acting under color of law, "with specific intent to deprive Castellano of his *constitutional rights*" (emphasis added). Damages had been

43

submitted to the jury globally; it returned compensatory damages of $3 million, with $1.5 million attributed each to Fragozo and Sanchez. Additionally, finding Fragozo and Sanchez had acted with malice, willfulness, or callous and reckless indifference, the jury awarded $500,000 in punitive damages — $250,000 each against Fragozo and Sanchez. Judgment was entered in mid-April 2000.

Fragozo and Sanchez moved for JMOL or, in the alternative, for a new trial. They again asserted, *inter alia*: there is no basis, as a matter of law, for a § 1983 malicious prosecution claim, or at least not one premised on Fourteenth Amendment due process violations, which, according to them, were the violations Castellano had alleged. In rejecting that assertion and denying the motions, the magistrate judge referenced his earlier summary judgment order. *That order, however, had held Castellano's claim survived only on Fourth — not Fourteenth — Amendment grounds.*

II.

Fragozo and Sanchez raise numerous issues touching every aspect of the trial. As noted, this dissent addresses only two: the confused (in fact, erroneous) precedent in our circuit allowing a § 1983 malicious prosecution claim; and the concomitant reversible error in the jury instructions.

Appellants' primary points concern our limited jurisdiction in our federal system. What rights cognizable in federal court were violated; what damages flow from them? In essence, Castellano seeks recovery for the common-law tort of malicious prosecution; but, *for his own reasons*, he has pressed it under § 1983. (One reason given by Castellano at oral argument on appeal was his concern that, for a state-law malicious prosecution, Fragozo would have immunity under state law, leaving Sanchez as the only defendant.)

Our circuit precedent permits such a claim in some form. But, the understandable confusion, as noted in *Gordy*, over the bases for such a claim dressed in § 1983 garb, discussed in detail *infra*, may

44

have been the reason for reversible error arising out of the jury instructions about it. In any event, this case should be reviewed *en banc* in order to clarify the elements of, and permissible damages for, a § 1983 malicious prosecution claim.

Toward that end, an extensive analysis of the relevant precedent follows. In this regard, for decisions subsequent to the earlier noted *Albright v. Oliver*, 510 U.S. 266 (1994), my research reveals only one by this court where, as here, the malicious prosecution plaintiff prevailed on the merits in district court (*Gordy*; judgment vacated). It appears that there has not been one decision in which damages of the size at issue here were awarded. Instead, our post-*Albright* precedent primarily concerns qualified immunity for § 1983 malicious prosecution claims.

A.

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws*, shall be liable to the party injured in an action at law ... for redress....

42 U.S.C. § 1983 (emphasis added).

"The first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979) (quoting 42 U.S.C. § 1983). Obviously, "[n]ot every common law tort committed by state or local government officials is actionable under § 1983". *Brummett v. Camble*, 946 F.2d 1178, 1183 (5th Cir. 1991), *cert. denied sub nom.* 504 U.S. 965 (1992).

Common-law malicious prosecution concerns "the groundless institution of criminal proceedings against the plaintiff". *Nesmith v. Alford*, 318 F.2d 110, 118 (5th Cir.) (quoting WILLIAM

45

L. PROSSER, TORTS § 12 (2d ed. 1955)), *cert. denied sub nom.* 375 U.S. 975 (1963). The tort "involve[s] a delicate balance between society's interest in the efficient enforcement of the criminal law and the individual's interest in freedom from unjustifiable and oppressive criminal prosecution". *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997). Its elements under Texas law — relevant to this action and consistent with the law of other States — are:

> (1) a criminal prosecution was commenced against the plaintiff; (2) *the prosecution was initiated or procured by the defendant*; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) *the defendant lacked probable cause to instigate the prosecution*; (6) the defendant acted with malice in bringing about the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution.

*Rodriguez v. Wal-Mart Stores, Inc.*, 52 S.W.3d 814, 820 (Tex. App. — San Antonio 2001) (emphasis added); *Thrift v. Hubbard*, 974 S.W.2d 70 (Tex. App. — San Antonio 1998, *review denied*); *see also Richey*, 952 S.W.2d at 516; *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292-93 (Tex. 1994).

While related to other common-law torts, especially abuse of process, malicious prosecution is distinguished by its focus on the institution — or, in Texas common-law terms, "initiation" or "procurement" — of criminal proceedings. Whereas the essence of abuse of process is "misusing[] or misapplying process justified in itself for an end other than that which it was designed to accomplish", the gist of malicious prosecution is "*commencing* an action or *causing* process to issue without justification". W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 121, at 897 (5th ed. 1984) (emphasis added). That distinction is well established in Texas law. "It is critical to a cause of action for abuse of process that the process be improperly used *after* it has been issued. If wrongful intent or malice *caused* the process to be issued initially, the claim is instead one for malicious prosecution."

46

*Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App. — Houston 1994, *writ denied*) (internal citations omitted; second emphasis added). A consequence of the distinction is that, for abuse of process, a plaintiff need not prove the proceeding terminated in his favor or was instigated without probable cause. *See* PROSSER, § 121, at 897.

Although process is usually "caused" to issue as a result of a charge filed by the malicious prosecution defendant, a person may be liable for "procuring" a criminal prosecution "if [as claimed in this case] his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred". *Lieck*, 881 S.W.2d at 293 (internal quotation marks omitted). Although ordinarily "[a] person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury", liability may lie where, as claimed in this action, "the person provides information which he knows is false". *Id.* (internal quotation marks omitted).

Malicious prosecution is also a close cousin of false imprisonment. The critical distinction is that malicious prosecution generally lies where the plaintiff was detained pursuant to legal process; false imprisonment, where the plaintiff's arrest was accomplished without process issuing (*e.g.*, without a warrant). *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994) ("The common-law cause of action for malicious prosecution ..., unlike the related cause of action for false arrest or imprisonment, ... permits damages for confinement imposed pursuant to legal process.").

Texas has long observed this difference. "Hence the distinction at common law between the action for false imprisonment and that for malicious prosecution[:] The first could be maintained only when the arrest was made without legal process; and the latter when the process of the law had been perverted and improperly used without probable cause and for a malicious purpose." *Hubbard v. Lord*,

47

59 Tex. 384, 385-86 (1883) (internal citations omitted). Of course, the situation might arise where a detention effected without process is followed by an improper prosecution. In such a situation, "the plaintiff may be required to assert both false imprisonment and malicious prosecution to recover all his damages". PROSSER, § 119, at 886.

Again, the interest at issue in common-law malicious prosecution, as the name of the claim makes clear, is "the individual's interest in freedom from unjustifiable and oppressive *criminal prosecution*". ***Richey***, 952 S.W.2d at 517 (emphasis added). *In short, it reaches far beyond an improper arrest — a target of the Fourth Amendment.* Accordingly, "[t]he *elements of damage* in cases of malicious prosecution are physical injury, injury to feelings and reputation, injury to property, loss of time, and expenses". ***Equitable Life Assurance Soc'y of the U.S. v. Lester***, 110 S.W. 499, 502 (Tex. Civ. App. 1908) (emphasis added). Moreover, "[a] suit for malicious prosecution so far partakes of the nature of a criminal proceeding as to admit of the recovery of exemplary damages in the nature of a penalty". ***McManus v. Wallis***, 52 Tex. 534, 547 (1880).

Our court has recognized § 1983 malicious prosecution claims. And, it has suggested that the *common-law* tort of malicious prosecution, *by itself*, may somehow amount to deprivation of a constitutional right. *See, e.g.,* ***Gordy***, 294 F.3d at 725 (cited by majority). But, our court has not clearly identified the federal right implicated by malicious prosecution.

In ***Shaw v. Garrison***, 467 F.2d 113 (5th Cir.), *cert. denied*, 409 U.S. 1024 (1972), our court recognized a claim akin to the current one for § 1983 malicious prosecution. Shaw had been acquitted in a state criminal prosecution for conspiracy to assassinate President Kennedy. ***Id.*** at 114. In that proceeding, Shaw testified he did not know his alleged co-conspirators. ***Id.*** After Shaw's acquittal, the State charged he had lied in that regard. ***Id.***

48

While the perjury prosecution was pending, Shaw sought federal injunctive relief under, *inter alia*, § 1983. *Id.* at 115. The district court enjoined the perjury prosecution, finding it "was brought in bad faith and for purposes of harassment". 328 F. Supp. 390, 400 (E.D. La. 1971). On appeal, our court recognized a "federal right to be free from bad faith prosecutions", holding that showing such prosecution "is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger* [*v. Harris*, 401 U.S. 37 (1971)]".[76] 467 F.2d at 120. Accordingly, our court affirmed the injunction. *Id.* at 122.

*Shaw* did not identify the source or nature of the constitutional right violated by a "bad faith prosecution". Subsequent case law, however, seemed to identify Fourteenth Amendment due process. In *Wheeler v. Cosden Oil & Chem. Co.*, 734 F.2d 254 (5th Cir. 1984), our court had to determine whether the § 1983 claim recognized in *Shaw* survived *Gerstein v. Pugh*, 420 U.S. 103 (1975). *Wheeler* characterized *Gerstein* as holding

> that the Fourth Amendment requires of the states a judicial or neutral determination of probable cause to arrest as a prerequisite for extended restraint of liberty following arrest, and specifically that a prosecutor's decision to prosecute is not a constitutionally sufficient determination of probable cause.

*Wheeler*, 734 F.2d at 258. *Wheeler* recognized that, under *Gerstein*, "this Fourth Amendment protection is attendant on *arrest and detention alone* and does not bear on the *decision* to prosecute". *Id.* at 259 (emphasis added). Therefore, our court was left to answer what level of suspicion, if any, is requisite for a prosecutor's decision to charge. *Id.*

---

[76]     *Younger* and its progeny explicated the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances". *Younger*, 401 U.S. at 41.

49

After exploring the text of the Fourth Amendment, policy considerations, and *Gerstein*, our court concluded: "[T]he *Fourteenth* Amendment imposes a duty on state prosecutors to charge only upon ascertaining probable cause". *Id.* at 260 (emphasis added).[77] Because *Shaw* simply "enjoined a state prosecution for perjury on the ground that it was brought 'in bad faith'—*i.e. without probable cause*", *id.* at 258 (emphasis added), *Wheeler* held a § 1983 malicious prosecution claim survived *Gerstein*. *Id.* at 260.

*Brummett v. Camble*, 946 F.2d 1178 (5th Cir. 1991), *cert. denied*, 504 U.S. 965 (1992), cast some doubt on a § 1983 malicious prosecution claim. A footnote to that opinion, which otherwise recognized the action as part of our precedent, questioned "[w]hether *Wheeler* would survive the Supreme Court's recent attempts to predicate constitutional rights on a more textual footing", because *Wheeler* had rested "on the *implied* constitutional right to have charges brought only upon probable cause". *Id.* at 1181 n.2 (emphasis added). That footnote clarified that "*Wheeler* would, however, clearly survive to the extent that a malicious prosecution caused a plaintiff's pretrial detention or otherwise infringed specific constitutional guarantees". *Id.*

At long last, the earlier cited *Albright v. Oliver*, 510 U.S. 266 (1994), provided some guidance. It addressed whether violation of Albright's claimed Fourteenth Amendment substantive due process

---

[77]     Significantly, review of the Fourth Amendment merely informed our court that the Amendment's clause providing "no Warrants shall issue, but upon probable cause", U.S. CONST. amend. IV, "clearly *contemplates* that before any person is seized by the State *someone* must first have determined that there was probable cause to believe he had broken the law". *Wheeler*, 734 F.2d at 259 (first emphasis added). Our court declined to decide whether that clause applied in *Wheeler*. In later cases, our court noted that malicious prosecution claims could, in fact, implicate Fourth Amendment guarantees, but *only* where "the individual complains of an arrest, detention, and prosecution without probable cause". *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988); *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992) (same). *See* text *infra*.

right to be free of prosecution without probable cause — essentially the same right on which our court premised its holding in *Wheeler* — could serve as the basis for a § 1983 malicious prosecution claim. *Id.* at 268.

Upon becoming aware of a warrant for his arrest on a drug-related charge, Albright surrendered to Officer Oliver and was released after posting bond. *Id.* His release was conditioned on his agreeing not to leave the state without court permission. *Id.* At a preliminary hearing, at which Officer Oliver allegedly gave misleading testimony, the state court found probable cause to try Albright. *Id.* at 269, 279. Subsequently, the case was dismissed pretrial, because the charge did not state an offense under state law. *Id.* at 269.

Albright then brought an action under § 1983 against the Officer, claiming he had "deprived him of substantive due process under the Fourteenth Amendment — his '*liberty interest*' — to be free from criminal prosecution except upon probable cause". *Id.* at 269 (emphasis added). The complaint also presented a common-law malicious prosecution claim against the Officer. *Id.* at 269 n.2.

A plurality opinion, written by Chief Justice Rehnquist and joined by Justices O'Connor, Scalia, and Ginsburg, began by surveying the approaches circuits had taken for § 1983 malicious prosecution claims. Noting that "[m]ost of the lower courts recognize some form of malicious prosecution action under § 1983", the plurality pinpointed the disagreement as "whether malicious prosecutions, *standing alone*, can violate the Constitution". *Id.* at 270 n.4 (emphasis added). It stated that the Third Circuit had provided for the most expansive claim, "hold[ing] that the elements of a malicious prosecution action under § 1983 are the same as the common-law tort of malicious prosecution". *Id.* (citing *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988)). "Other Circuits, however, require[d] a showing of some injury or deprivation of a constitutional magnitude *in addition to* the traditional elements of common-

51

law malicious prosecution." *Id.* (emphasis added). Citing our court's opinion in *Sanders*, *supra* note 3, the plurality characterized our circuit's position as more akin to that of the Third Circuit.

The plurality reiterated that "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred'". *Id.* at 271 (quoting *Baker*, 443 U.S. at 144 n.3). Albright had claimed violation of a "substantive due process right to be free of prosecution without probable cause", *id.*; but, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, *that Amendment, not the more generalized notion of substantive due process*, must be the guide for analyzing these claims". *Id.* at 273 (citation and internal quotation marks omitted; emphasis added). Because "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it", the plurality concluded that "substantive due process ... can afford [Albright] no relief". *Id.* at 274, 275. *The plurality refused to decide whether Albright's claim would have succeeded had it been framed to implicate a Fourth Amendment violation. Id.* at 275.

In addition to joining the plurality opinion, Justice Scalia separately emphasized: "[I]t [was] unlikely that the procedures constitutionally 'due,' with regard to an arrest, consist of anything more than what the Fourth Amendment specifies"; and, with the exception of certain "long established and narrowly limited" substantive protections incorporated by the Court into the Fourteenth Amendment, the Due Process Clause does not "guarantee[] certain (unspecified) liberties". *Id.* at 275 (Scalia, J., concurring).

Justice Kennedy, whom Justice Thomas joined, concurred in the judgment but wrote separately because he understood "Albright's due process claim concern[ed] not his arrest but instead the malicious initiation of a baseless criminal prosecution against him". *Id.* at 281 (Kennedy, J., concurring

52

in the judgment). This notwithstanding, and significantly for purposes of Castellano's action, Justices Kennedy and Thomas "agree[d] with the plurality that *an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process*". ***Id.*** (emphasis added). Nevertheless, in the light of precedent that "a state actor's random and unauthorized deprivation of th[e] interest [in freedom from malicious prosecution] cannot be challenged under [§] 1983 so long as the State provides an adequate postdeprivation remedy", ***id.*** at 284 (citing ***Parratt v. Taylor***, 451 U.S. 527, 535-44 (1981)), and because *state law* afforded Albright an action for malicious prosecution, Justices Kennedy and Thomas saw "neither need nor legitimacy to invoke § 1983". ***Id.*** at 286.[78]

Justice Souter also concurred in the judgment but wrote separately, in part to emphasize that "[t]here may indeed be exceptional cases where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure". ***Id.*** at 291 (Souter, J., concurring in the judgment). Still, in concluding that Albright had not established a substantive due process violation, Justice Souter agreed with the plurality that Albright's claim "present[ed] no substantial burden on liberty beyond what the Fourth Amendment is generally thought to redress already". ***Id.*** at 288-89.

In addition to joining the plurality opinion, Justice Ginsburg opined that Albright would have stated a claim had he pressed a Fourth Amendment, rather than a Fourteenth Amendment substantive due process, right. ***Id.*** at 276-77 (Ginsburg, J., concurring). She opined that Albright may have

---

[78] The Seventh Circuit recently adopted this view, holding that, where, as in the case at hand, state law provides a malicious prosecution damages remedy, there is no such constitutional damages remedy. ***Newsome v. McCabe***, 256 F.3d 747 (7th Cir. 2001).

abandoned a Fourth Amendment avenue of approach because he

> feared that courts *would narrowly define the Fourth Amendment's key term "seizure" so as to deny full scope to his claim.* In particular, he might have anticipated a holding that the "seizure" of his person ended when he was released from custody on bond, and a corresponding conclusion that Oliver's allegedly misleading testimony at the preliminary hearing escaped Fourth Amendment interdiction.

*Id.* at 277 (emphasis added).

For Justice Ginsburg, however, the duration of a seizure might "continue even after release from official custody", because the released defendant may be: haled into court on the State's command; required to obtain permission before traveling outside the court's jurisdiction; and subjected to diminished employment prospects, reputational harm, and the financial/emotional strain of preparing a defense. *Id.* at 277-78. In that light, the allegedly misleading testimony by Albright's arresting officer at the preliminary hearing "served to maintain and reinforce the unlawful haling of Albright into court, and so perpetuated the Fourth Amendment violation". *Id.* at 279. The Court, however, has never adopted such an expansive concept of Fourth Amendment "seizure".

Nor have our post-*Albright* decisions clarified the contours of a § 1983 malicious prosecution claim. *Johnson v. La. Dep't of Agric.*, 18 F.3d 318 (5th Cir. 1994), concerned a § 1983 malicious prosecution claim for a *First* Amendment deprivation. Our court noted: "The Supreme Court ... recently held [in *Albright*] that malicious criminal prosecution, if actionable in constitutional law, should be governed by the Fourth Amendment rather than substantive due process, with its 'scarce and open-ended' 'guideposts'". *Id.* at 320 (quoting *Albright*, 510 U.S. at 275). Noting that "it is an even more complex question whether and on what basis a First Amendment claim of malicious prosecution can be made", our court stated: "Whether the Constitution comprehends any such claim is far from

54

clear". *Id.* Regardless, our court held that, at a minimum, "if the First Amendment protects against malicious prosecution, Johnson must *not only* allege a deprivation of a constitutional right, *but must also* establish all of the elements of the common law tort action". *Id.* (emphasis added). Because Johnson had not satisfied the favorable-prosecution-termination element of the common-law tort, the district court's dismissal was upheld.

Another of our early post-*Albright* opinions considered the validity of, but did not reach the merits for, a § 1983 malicious prosecution claim. In so doing, our court explained: "*Albright* held that pre-trial deprivations of liberty, such as malicious prosecution, are not actionable under the Fourteenth Amendment, *but left open the possibility* that such claims would be actionable under the Fourth Amendment". *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1303 (5th Cir. 1995) (emphasis added), *cert. denied sub nom.*, 517 U.S. 1191 (1996).

*Eugene* then observed in *dictum*: "This circuit has explicitly held that malicious prosecution, false arrest and bodily harm are actionable under Section 1983 because they violate the Fourth and Fourteenth Amendments". *Id.* For that proposition, our court cited *Sanders*, *supra* note 3. *Sanders*, a pre-*Albright* case, recognized that malicious prosecution "implicate[s] the *constitutional guarantees of the fourth and fourteenth amendments when the individual complains of an arrest, detention, and prosecution without probable cause*". *Sanders*, 950 F.2d at 1159 (emphasis added; quoting *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)). *Eugene* failed, however, to reiterate this qualifying language. Moreover, *Eugene* recognized the right against malicious prosecution as "clearly established" under the *Fourth* Amendment but justified that assertion only by citing *Shaw*, *supra*, the earlier-discussed *Fourteenth* Amendment, pre-*Albright* case. *See Eugene*, 65 F.3d at 1305; *see also Kerr v. Lyford*, 171 F.3d 330, 342 & n.8 (Jones, J., specially concurring) (questioning the *Eugene*

55

opinion).

Our court made similarly questionable conclusions in *Evans v. Ball*, 168 F.3d 856 (5th Cir. 1999). There, our court had to decide, *inter alia*, whether a plaintiff claiming "prosecution unsupported by probable cause" had, for purposes of defeating qualified immunity, stated a violation of a clearly established constitutional right. *Id.* at 862 n.9. Our court construed the claim as one for malicious prosecution, because "a prosecution that is unsupported by probable cause but does not rise to the level of malicious pro secution is not a clearly established constitutional violation". *Id.* It observed, quite correctly, that "the text of the Fourth Amendment does not support the proposition that a *prosecution* not based on probable cause is a constitutional violation". *Id.* (emphasis added). It failed, however, to consider whether the text of the Fourth Amendment supports the proposition that a *malicious prosecution* is necessarily a constitutional violation. Instead, citing a pre-*Albright* opinion (as had *Eugene*), it simply reiterated "that malicious prosecution may be a constitutional violation, but only if all of its common law elements are established". *Id.* (citing *Brummett*, 946 F.2d at 1183).

Next in our significant post-*Albright* decisions was *Kerr v. Lyford*, 171 F.3d 330 (5th Cir. 1999). *Kerr* affirmed the summary judgment awarded § 1983 defendants; but, the majority opinion, citing *Eugene*, spoke of a "longstanding recognition of a Fourth Amendment right to be free from malicious prosecution". *Id.* at 339. Again, as had *Eugene*, the *Kerr* majority opinion failed to mention that this "longstanding recognition" applied only where "the individual complains of an arrest, detention, and prosecution without probable cause".[79] *See supra* note 2.

---

[79] Our court's not requiring *independent* proof of a Fourth Amendment violation, even post-*Albright*, has not gone unnoticed. *See, e.g.*, *Frantz v. Village of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001) (citing *Kerr* as an example of a circuit's analyzing § 1983 malicious prosecution claims under state-law elements and not under the Fourth Amendment); *Lambert v.*

56

The special concurrence in *Kerr*, joined by another member of the panel, was our court's first attempt, in the light of *Albright*, to address the problems of allowing a § 1983 malicious prosecution claim. After noting that "the *Albright* plurality, rather than endorsing a Fourth Amendment tort of malicious prosecution, declined to address the issue", the special concurrence emphasized: "[E]ven if *Albright* left room for such a claim under the Fourth Amendment, there is a significant difference between predicating the cause of action on the Fourth Amendment and the Fourteenth". *Kerr*, 171 F.3d at 342-43 (Jones, J., concurring). As the special concurrence noted, this fact is evident in the very need to decide *Albright*: "On the most superficial level, if the grounds for the claim under the Fourth and Fourteenth Amendments were equivalent, there would have been no need to distinguish between those amendments in *Albright*". *Id.* at 343. Finally, and most significantly, it observed:

> [T]he tort of malicious prosecution *fits uneasily* within the Fourth Amendment. That amendment proscribes unreasonable searches and seizures and has been held to prohibit arbitrary law enforcement actions up until the time of arraignment. *To justify a Fourth Amendment malicious prosecution claim, then, one has to extend the period of "seizure" past arraignment*.

*Id.* (emphasis added).[80] This "uneasy fit" is again discussed in *Gordy*, 294 F.3d at 725-27.

---

*Williams*, 223 F.3d 257, 261 (4th Cir. 2000) (same), *cert. denied*, 531 U.S. 1130 (2001).

[80]   This seizure-expansion concern is correct for almost all § 1983 malicious prosecution claims. Under certain circumstances, however, it may not hold. As discussed *supra*, malicious prosecution is the appropriate common-law vehicle for challenging an unreasonable seizure effected "pursuant to legal process". *See also* **Heck v. Humphrey**, 512 U.S. 477, 484 (1994) ("The common-law cause of action for malicious prosecution provides the closest analogy to claims of the type considered here because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process.").

Where, as here, the arrest is by warrant, then the arrest is pursuant to legal process. Therefore, such an arrest could serve as the starting point for the "seizure" required to justify a § 1983 malicious prosecution claim. In that situation, for a prosecution that continued past the arraignment, the period of "seizure" would have to be likewise extended for purposes of the §

The key seizure/arraignment incongruity noted in the **Kerr** special concurrence is hardly the lone peculiarity of recognizing a § 1983 malicious prosecution claim. As Justice Ginsburg noted in her **Albright** concurrence,

> Albright's reliance on a "malicious prosecution" theory, rather than a Fourth Amendment theory, is anomalous. The principal player in carrying out a prosecution — in the formal commencement of a criminal proceeding — is not police officer but prosecutor. Prosecutors, however, have absolute immunity for their conduct. Under Albright's substantive due process theory, the star player is exonerated, but the supporting actor is not.

**Albright**, 510 U.S. at 279 n.5 (Ginsburg, J., concurring) (internal quotations and citations omitted).

Yet another peculiarity concerns the limitations period for a § 1983 malicious prosecution claim. *If* the post-**Albright** justification for a § 1983 malicious prosecution claim is the Fourth Amendment, then some might maintain that the limitations period should run from the date of arrest, rather than from the occurrence of the last element of the malicious prosecution tort (termination of the prosecution in plaintiff's favor). *See id.* at 280 & n.6 (Ginsburg, J., dissenting). But, as have some other circuits, our court has held, without acknowledging the basis for debate, that the limitations

---

1983 claim.

The same is true for a *warrantless* arrest, which, of course, is *not* effected pursuant to legal process. In that situation, generally, *the legal process begins with arraignment*. Accordingly, to justify a § 1983 malicious prosecution claim, such a plaintiff would have to extend the period of seizure past the arraignment — *e.g.*, by claiming his being bound-over for trial constitutes a "seizure". *See generally* **Singer v. Fulton County Sheriff**, 63 F.3d 110, 116-17 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996).

On the other hand, the defendant may be arrested pursuant to warrant, but the prosecution dismissed before or at the arraignment. For such instances, the period of "seizure" need not be expanded.

58

period accrues as of the prosecution's termination.  *See Eugene*, 65 F.3d at 1306.[81]

Of course, because the favorable termination is an element of a § 1983 malicious prosecution claim, accrual at that point is understandable — certainly in theory.  On the other hand, *if* the constitutional basis for this § 1983 claim is the underlying seizure (arrest), it may occur any time from shortly before the favorable termination to years before it, as in Castellano's situation.  Instances in which the arrest is far removed from the favorable termination, especially because of the possible resulting loss of evidence concerning the arrest, vividly demonstrate the "uneasy fit" of malicious prosecution under § 1983, based on the Fourth Amendment.[82]

---

[81]     Some circuits have also addressed this issue.  In **Brooks v. City of Winston-Salem**, 85 F.3d 178 (4th Cir. 1996), the Fourth Circuit held that a § 1983 claim for a *warrantless* arrest unsupported by probable cause — a claim most analogous to the common-law tort of false arrest — accrues as of the date of arrest.  *See id.* at 182.  However, a § 1983 claim for an arrest made by warrant unsupported by probable cause — more analogous to the common-law tort of malicious prosecution — accrues from the time of favorable termination.  *See id.* at 183.  *See also* **Uboh v. Reno**, 141 F.3d 1000, 1006 (11th Cir. 1998) (holding that § 1983 malicious prosecution claim accrues on the date of favorable termination).

Justice Ginsburg suggested there might not be a difference between the point of arrest and the point of termination; in her view, a Fourth Amendment "seizure" may continue so long as prosecution remains pending and, therefore, "[t]he time to file the § 1983 action should begin to run not at the start, but at the end of the episode in suit, *i.e.*, upon dismissal of the criminal charges".  *See* **Albright**, 510 U.S. at 280 (Ginsburg, J., concurring).  As noted earlier, however, such an approach requires a significant expansion of our understanding of the Fourth Amendment's protections.

[82]     **Heck** casts some light on this limitations question.  There, the Court considered whether a state prisoner's "§ 1983 cause of action for damages attributable to an unconstitutional conviction or sentence", 512 U.S. at 489-90, could proceed in the light of the fact that success on the claim would "call into question the lawfulness of conviction or confinement", *id.* at 483.  For assistance in answering that question, **Heck** looked to common-law malicious prosecution "because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process".  *Id.* at 484.  Noting that an element of the common-law tort is termination of the prior criminal proceeding in favor of the accused, and that the same policy reasons apply to § 1983 claims, the Court held Heck's claim barred.  "Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have

59

But perhaps the most troubling — and thus far overlooked — problem with a § 1983 malicious prosecution claim concerns probable cause. One of the earlier listed elements of *common-law* malicious prosecution is that "the defendant lacked probable cause to instigate the prosecution". ***Rodriguez v. Wal-Mart Stores, Inc.***, 52 S.W.3d 814, 820 (Tex. App. — San Antonio 2001); ***Thrift v. Hubbard***, 974 S.W.2d 70 (Tex. App. — San Antonio 1998, *review denied*).

As noted, Texas law dictates the common-law elements in the present case and is not atypical on this particular point. The requisite lack of probable cause is defined as "the [lack of the] existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts *within the knowledge of the prosecutor [complainant]*, that the person charged was guilty of the crime for which he was prosecuted". ***Richey v. Brookshire Grocery Co.***, 952 S.W.2d 515, 517 (Tex. 1997) (alteration in original; emphasis added) (quoting ***Akin v. Dahl***, 661 S.W.2d 917, 921 (Tex. 1983)); ***Brown v. NationsBank Corp.***, 188 F.3d 579, 586 (5th Cir. 1999) (same), *cert. denied sub nom.* 530 U.S. 1274 (2000). "[T]he probable cause inquiry focuses only on the actions of the complainant, based upon *his* perspective of the facts *at the time the report was made*, and not on the subsequent actions of third-parties or information discovered after the fact". ***Thrift***, 974 S.W.2d at 79 (emphasis added).

---

terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." ***Id.*** at 489-90 (internal citations omitted).

Along this line, several observations about ***Heck*** are warranted. First, it is not clear that Heck's § 1983 claim was *for* malicious prosecution. Although the Court determined that malicious prosecution was the closest *common-law* analogy to Heck's claim, it referred to his claim as one "for damages attributable to an unconstitutional conviction or sentence", ***id.*** at 490, and "to recover damages for allegedly unconstitutional conviction or imprisonment", ***id.*** at 486. Moreover, ***Albright*** had been decided only four months earlier; but ***Heck*** does not mention ***Albright***. Finally, the allegations in ***Heck*** included, *inter alia*, pre-trial and trial abuses that went well beyond the "initiation" or "procurement" of a criminal proceeding.

On the other hand, for a *Fourth Amendment* seizure (arrest), the relevant touchstone post-

*Albright*, the probable cause inquiry differs on several fundamental, and profoundly important, levels.

> Probable cause to arrest an individual exists when the facts and circumstances within *the arresting officer's* personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed. A magistrate determines that probable cause exists from the totality of circumstances presented to him in the warrant application. We review his decision, and the police officer's decision to seek an arrest warrant, by evaluating the facts available *to the officer at the time he submitted the application*.

*Bennett v. Grand Prairie*, 883 F.2d 400, 404 (5th Cir. 1989) (emphasis added; footnotes, citations, and internal quotation marks omitted).

Several important features of this description distinguish Fourth Amendment probable cause from the probable cause at issue for common-law malicious prosecution. First, the former assesses probable cause *vel non* from the facts and circumstances within the knowledge of the arresting officer — not the complainant. Second, it measures probable cause *vel non* as of the time an application for the warrant is submitted — not when the complainant makes his report. In short, the Fourth Amendment probable cause inquiry is fundamentally distinct and separate from the probable cause inquiry for common-law malicious prosecution.[83]

---

[83] A point tangential to this probable cause discussion needs mentioning. It involves the malicious prosecution defendant's state of mind. The Fourth Amendment probable cause inquiry is an *objective* one. But, our continued reliance on the common-law elements requires us to look for malice in the defendant's actions. This inconsistency has induced at least one circuit to abandon the malice element:

> We recognize that actual malice is an element of a malicious prosecution claim at common law. And, common-law principles "provide the appropriate starting point for" determining the elements of § 1983 actions. However, the Supreme Court has indicated that the reasonableness of a seizure under the Fourth

At the very least, these incongruities cast doubt on whether, as a matter of law, a § 1983 malicious prosecution claim can exist. Nevertheless, our precedent compels recognizing the claim in some form. Restated, this panel is saddled with an anomalous claim. I reiterate the observation in the *Kerr* special concurrence: *Albright* did *not endorse* a Fourth Amendment tort of malicious prosecution. *See Kerr*, 171 F.3d at 342 (Jones, J., concurring); *see also Johnson*, 18 F.3d at 320 ("Significantly, the [*Albright*] Court expressed no view whether such a claim would succeed under the Fourth Amendment."); 1A SCHWARTZ, note 10, at 322 (noting that the various *Albright* opinions "add[] up to a fairly strong sentiment *against constitutionalizing malicious prosecution*" (emphasis added)). However, bound by our precedent recognizing a § 1983 malicious prosecution claim, only *en banc* review (or, of course, a decision by the Supreme Court) can settle whether such a claim can exist. As stated, it is my hope — and request — that this case be the vehicle for doing so.

The task at present, then, is to ensure that, for the § 1983 malicious prosecution claim presented here, this panel maintains — to the extent possible — consistency with the dictates of § 1983, the Fourth Amendment, *Albright*, and our precedent. The latter requires a § 1983 malicious prosecution plaintiff to prove the common-law tort elements, including the *defendant's* lacking probable cause *at the time he reported the crime*. Section 1983 requires proving violation of a federal right. And, *Albright* seems to require that, *in a situation such as Castellano's*, the right violated be one secured

---

Amendment should be analyzed from an objective perspective.
Thus, we conclude that the subjective state of mind of the
defendant, whether good faith or ill will, is irrelevant in this context.

*Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996) (citations omitted); *see also* 1A MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION § 3.20, at 326 (3d ed. 1997) (noting that the Second Circuit appears to have abandoned the malice element).

by the Fourth Amendment.[84]

_____

[84]      Different circuits have interpreted the ***Albright*** requirement differently.  Some understand ***Albright*** to hold that a § 1983 malicious prosecution can *only* reside in the Fourth Amendment.  *See, e.g.*, ***Murphy v. Lynn***, 118 F.3d 938, 944 (2d Cir. 1997) ("[I]n order to prevail on [a malicious prosecution] claim under § 1983, the plaintiff must show a violation of his rights under the Fourth Amendment"), *cert. denied*, 522 U.S. 1115 (1998); *see also* ***Lambert v. Williams***, 223 F.3d 257, 262 (4th Cir. 2000) ("[T]here is no such thing as a '§ 1983 malicious prosecution' claim.  What we [have] termed a 'malicious prosecution' ... is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution — specifically, the requirement that the prior proceeding terminate favorably to the plaintiff".).

The Seventh Circuit formerly also interpreted ***Albright*** to require  a § 1983 malicious prosecution claim to be located in the Fourth Amendment.  ***Washington v. Summerville***, 127 F.3d 552, 558  (7th Cir. 1997) ("***Albright*** ... instructs that the only constitutional amendment that is implicated by a malicious prosecution claim is the Fourth Amendment."), *cert denied*, 523 U.S. 1073 (1990).  As noted, it abandoned that approach recently, holding: the concurring opinion of Justices Kennedy and Thomas in ***Albright*** controls; consequently, where state law provides a malicious prosecution damages remedy, there is no such constitutional damages remedy. ***Newsome***, 256 F.3d 747.

By contrast, the Third Circuit reads ***Albright*** "for the broader proposition that a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment". ***Torres v. McLaughlin***, 163 F.3d 169, 172 (3d Cir. 1998), *cert. denied*, 528 U.S. 1079 (2000). The Sixth Circuit interprets ***Albright*** differently yet:

> ***Albright*** holds only that in cases in which a Fourth Amendment violation has occurred, a § 1983 claim cannot be brought under notions of substantive due process.  ***Albright*** appears to acknowledge that in cases of egregious behavior that do not include a seizure, a plaintiff may have a § 1983 malicious prosecution claim supported by substantive due process rights.

***Frantz v. Village of Bradford***, 245 F.3d 869, 877 (6th Cir. 2001).

As noted, in a case involving a claim of malicious prosecution in violation of *First* Amendment rights, we stated:  "Whether the Constitution comprehends any such claim is far from clear".  ***Johnson***, 18 F.3d at 320.  However, whether a § 1983 malicious prosecution claim can have its roots anywhere *other* than in the Fourth Amendment is *not* at issue in this case.  Although Castellano complained of First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment violations, summary judgment was awarded Fragozo and Sanchez on all but the First and Fourth

Finally, for a Fourth Amendment violation, the plaintiff must prove the *arresting officer* lacked probable cause *at the time he applied for a warrant.* In sum, as discussed further below, it would seem that a § 1983 malicious prosecution plaintiff must allege and prove, *inter alia*, two unique instances of a lack of probable cause.

This approach — requiring proof of both the common-law tort elements *and* a Fourth Amendment violation — is not unique. Our court recently took that approach in ***Price v. Roark***, 256 F.3d 364 (5th Cir. 2001), noted *supra*. Officer Roark arrested Price on charges of a license tag violation and arson. Price was convicted for the tag violation; the arson charge was dropped. ***Id.*** at 367. He filed § 1983 false arrest and malicious prosecution claims relating to the arson charge. Officer Roark took an interlocutory appeal from the denial of qualified immunity. ***Id.*** at 368.

In addressing the false arrest claim, our court held there was probable cause concerning the tag violation and, as a result, probable cause existed for the arrest. ***Id.*** at 369-70. As for the malicious prosecution claim, it noted: "While we have recognized a § 1983 cause of action for malicious prosecution, 'it is fundamental to our federal jurisprudence that state tort claims are not actionable under federal law; a plaintiff under § 1983 must show deprivation of a federal right.'" ***Id.*** at 370 (citing ***Nesmith v. Taylor***, 715 F.2d 194, 196 (5th Cir. 1983)). Accordingly, our court held: "[T]o succeed on [his] § 1983 malicious prosecution suit, *Price must show that he was exposed to an unreasonable search or seizure in violation of the Fourth Amendment*". ***Id.*** (emphasis added). But, because the arrest was supported by probable cause for the tag violation, "Price suffered no violation of his Fourth Amendment rights". ***Id.*** at 367. Accordingly, Officer Roark was held entitled to qualified immunity.

Amendment claims. On appeal, Castellano has waived his First Amendment claim, stating that his malicious prosecution claim is rooted solely in the Fourth Amendment.

Pre-*Price*, a similar position was taken in *Johnson*, discussed *supra*. *Johnson* involved a claim for malicious prosecution in violation of *First* Amendment rights. Our court stated, without deciding whether such a claim is cognizable under the Constitution, that, "at the very least, if the First Amendment protects against malicious prosecution, [a plaintiff] must not only *allege* a deprivation of a constitutional right, but must also *establish* all of the elements of the common law tort action". *Johnson*, 18 F.3d at 320 (emphasis added).

As discussed in *Gordy*, 294 F.3d at 725-26, other circuits take this two-pronged approach. *See, e.g.*, *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.) ("[O]ur circuit takes the common law elements of malicious prosecution as the 'starting point' for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question, which it must, of whether the plaintiff has proven a *constitutional* violation [of] the Fourth Amendment's right to be free from unreasonable seizures." (emphasis added)), *cert. denied*, 519 U.S. 871 (1996); *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996) ("To state a claim for malicious prosecution under section 1983, a plaintiff must demonstrate that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty."); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ("Once a plaintiff presents a claim of malicious prosecution under § 1983, the court must engage in two inquiries: whether the defendant's conduct was tortious; and whether the plaintiff's injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment."), *cert. denied*, 517 U.S. 1189 (1996). *But see Frantz v. Village of Bradford*, 245 F.3d 869, 874-75 (6th Cir. 2001) ("We unanimously reject the reasoning of courts which have relied on the state law elements of malicious prosecution. We hold that establishing a § 1983 cause of action requires a constitutional violation and cannot differ depending on

the tort law of a particular state."); ***Lambert v. Williams***, 223 F.3d 257, 262 (4th Cir. 2000) ("[T]here is no such thing as a '§ 1983 malicious prosecution' claim. What we [have] termed a 'malicious prosecution' claim ... is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution — specifically, the requirement that the prior proceeding terminate favorably to the plaintiff".), *cert. denied*, 531 U.S. 1130 (2001).

The majority claims:

> [E]ven if this court were to require independent proof of a violation of the Fourth Amendment in addition to proof of the tort of malicious prosecution, the analysis in this case would not change as Castellano established a violation of his Fourth Amendment rights with proof that he was seized and convicted by virtue of fraudulent evidence fabricated by the defendants--one of whom was a police officer.

**Maj. Op. at 14 n. 17.** In any event, in light of the foregoing discussion, this case turns on the erroneous jury instructions.

B.

The jury instructions — based on the Fourteenth, rather than the applicable Fourth, Amendment — are a basis for reversible error. Fragozo and Sanchez premise reversible error on the jury's being instructed in terms of a Fourteenth Amendment right to "due process", instead of a Fourth Amendment right to be free from unreasonable seizure. In pertinent part, the instruction provided:

> Castellano claims that Alfred Castro and Chris Fragozo, while acting under color of law, intentionally violated his *constitutional right to due process* by maliciously prosecuting him for the criminal offense of arson. Castellano further claims that Maria Sanchez, as an individual, intentionally violated *the same constitutional right*.
>
> To prove such violation, Castellano must prove each of the following by a preponderance of the evidence:
>
> (1) The defendants intentionally committed *acts that deprived him of due process*;

66

....

> [T]o prove the defendants intentionally committed acts depriving him of *due process*, Castellano must prove they *maliciously prosecuted him* for the criminal offense of arson. *To prove this claim, Castellano must establish by a preponderance of the evidence each of the [common-law elements of malicious prosecution]....*

(Emphasis added.)

As discussed by the majority, neither Sanchez nor Fragozo objected to the instruction. Ordinarily, as also discussed by the majority, that failure would permit review only for plain error. FED. R. CIV. P. 51; *e.g., Tompkins v. Cyr*, 202 F.3d 770, 783 (5th Cir. 2000). Under that standard, our court may only correct an error that is "clear" or "obvious" and affects substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (*en banc*), *cert. denied*, 513 U.S. 1196 (1995). Even then, our court retains discretion whether to correct such an error; generally, we will do so only where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Olano*, 507 U.S. at 732 (internal quotation marks omitted; alteration in original); *see also Calverley*, 37 F.3d at 164. The burden is on the party charging error, *see Tompkins*, 202 F.3d at 779; and "we are exceedingly deferential to the trial court", *id.* at 784.

Castellano urges plain error review; and the majority applies that standard. No authority need be cited, however, for the rule that the reviewing court, not the parties, determines its standard of review.

Motions by Fragozo and Sanchez, and corresponding rulings by the district court, as well as the instructions proposed by Fragozo and Sanchez, place this standard of review issue in a most unusual — perhaps unique — posture. For the reasons that follow, it is not clear whether this panel should

67

review only for plain error or, instead, under the more lenient standard applied when an objection was properly made in the trial court to the instruction at issue on appeal.

As noted, in August 1998, long in advance of the April 2000 trial, the district court granted Sanchez summary judgment on whether the § 1983 malicious prosecution claim involved Fourteenth Amendment "due process" or Fourth Amendment "seizure", holding, *inter alia*:

> Claims of malicious prosecution are not actionable under the Fourteenth Amendment. ***Albright*** ...; ***Eugene***.... Claims of malicious prosecution are actionable, however, under the Fourth Amendment. ***Id.*** ... Rather, the Fourteenth Amendment simply makes applicable to the states the protections of the Fourth Amendment, which provides an explicit textual source of constitutional protection for a malicious prosecution claim. ***Smart v. Bd. Of Trustees of the Univ. Of Illinois***, 34 F.3d 432, 434 (7th Cir. 1994).

No authority need be cited for the fact that, unless and until the district court revisited and revised its summary judgment holding, that holding, for that issue, was the law of the case. The holding was never explicitly altered by the district court. But, the challenged instruction utilizing due process implicitly, and obviously, altered it. Needless to say, it would seem that, had the district court intended such a change, it would have made it explicitly.

The parties' proposed instructions were included with the pretrial order, filed approximately two months before trial. *Notwithstanding the summary judgment holding that Fourteenth Amendment due process was not in play*, Castellano's proposed instruction spoke, *inter alia*, of "[t]he right not to be deprived of liberty without due process of law" *in addition to* "[t]he right not to be subjected to an unreasonable seizure". Castro's proposed instructions also keyed on the "right not to be deprived of liberty without due process of law".

In short, Castellano and Castro's proposed instructions are totally at odds with the law of the

68

case established by the earlier summary judgment holding. My review of the record reveals no reason for this.

On the other hand, the instructions proposed by Sanchez, and adopted by Fragozo, spoke of being "deprived of liberty" in violation of the Constitution, without linking the deprivation to the "without due process" qualifier. The Fourth Amendment, however, was not mentioned. Consequently, Sanchez and Fragozo's proposed instructions could be read to fall under either the Fourth or Fourteenth Amendment, because, of course, the Fourteenth Amendment proscribes being "deprive[d] of ... liberty ... without due process of law", while the Fourth Amendment proscribes certain types of "seizures" — which equates with "deprivation[s] of liberty".

On balance, Sanchez and Fragozo's proposed instructions fall much more under the Fourth, than the Fourteenth, Amendment, especially in the light of the controlling case law and, even more so, because of the law of the case. Accordingly, I do not consider their proposed instructions to have constituted "invited error". *E.g.*, **Flores v. Cameron County**, 92 F.3d 258, 270 n.9 (5th Cir. 1996) (noting that when the district court "derive[s] [an] instruction ... from [a party's] proposed jury instructions" and that party does "not object to th[e] instruction", "the invited error doctrine ordinarily ... preclude[s] ... review of th[e] instruction"). (In any event, as discussed *infra*, their proposal was not utilized by the magistrate judge. As quoted *supra*, he used "violated [Castellano's] constitutional right *to due process* by maliciously prosecuting him". (emphasis added))

At trial, however, the JMOL motions referenced the fact that, as the district court had held almost 28 months earlier, the Fourth, not the Fourteenth, Amendment was in play. After Castellano presented his case, the City, citing **Kerr**, especially the concurring opinion discussed *supra*, urged in support of JMOL that "there is no malicious prosecution cause of action as a matter of law under

69

Section 1983", having noted that, under *Albright*, such a claim did not lie under the Fourteenth Amendment. Fragozo joined in expressing doubt whether a malicious prosecution claim can be presented under § 1983.

Finally, through Sanchez, the court was then reminded about its law of the case established by its summary judgment holding — specifically that the court

> had clearly pointed out that malicious prosecution under the 14th Amendment does not exist, and indicated that it exists under the Fourth Amendment. *And so this case survived at least to proceed to trial under that particular theory.*

(Emphasis added.) And, citing the concurring opinion in *Kerr*, Sanchez noted the question of whether challenged actions subsequent to arrest "survive[d] under the [§ 1983] malicious prosecution cause of action".

In response, Castellano made no mention of the defendants' contentions regarding Fourteenth Amendment due process not being applicable. Nor did he mention the summary judgment holding. (Castellano's new counsel did not appear in the case until approximately nine months after that ruling; but, of course, he had constructive, if not actual, knowledge of it.) Again, the record does not reveal why, in opposing JMOL, Castellano made no mention of that controlling summary judgment holding.

In ruling on the motions, the court granted the City's but denied those of the remaining Defendants. Without explanation, it denied judgment for Fragozo and Sanchez. Restated, the magistrate judge made no mention of the Fourth versus Fourteenth Amendment issue.

After the remaining Defendants presented evidence, and prior to the case going to the jury, those Defendants, during the charge conference, renewed their JMOL motions, being allowed by the court to adopt their earlier arguments. The motions were summarily denied.

70

The charge, apparently prepared by the magistrate judge, makes no mention of Fourth Amendment seizure. Instead, as quoted earlier, it speaks of Fourteenth Amendment "due process". At the charge conference, however, no reference, much less objection, was made to such use of Fourteenth Amendment "due process" instead of Fourth Amendment "seizure".

As noted, the jury found *for* Castro. Post-verdict, Sanchez and Fragozo moved for JMOL or, in the alternative, for a new trial. One basis urged for JMOL, as noted by the district court, was "because there is no constitutional cause of action for malicious prosecution". Citing its earlier summary judgment holding, the court stated it had

> already ruled on Sanchez's and Fragozo's contentions regarding this issue. (Docket no. 132 [the summary judgment ruling]). The parties do not present any new evidence or argument to persuade the Court to change its position on this issue.

But, again, the court failed to *explain why* it had instructed the jury on *due process* when it had held the § 1983 claim was grounded in the Fourth, not the Fourteenth, Amendment.

In the light of the foregoing events, this panel is faced with many interesting and perplexing procedural questions, about which there is not a great deal of case law. Does the law of the case trump the failure to object? As permitted in certain instances by our circuit precedent, *see*, *e.g., Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 432 (5th Cir. 1996), did the arguments presented in support of the pre-verdict JMOL motions constitute sufficient objections to the charge, especially since, during the charge conference, the court allowed the renewed JMOL motions to simply adopt the arguments made only a few hours earlier, prior to the brief evidence presented by the remaining Defendants?

These questions need not be addressed. Assuming the majority is correct that we review only

for plain error, there is reversible error. Of course, the instructions must be viewed as a whole. *See United States v. Peterson*, 244 F.3d 385, 395 (5th Cir.), *cert. denied*, 122 S. Ct. 133 (2001), *and cert. denied*, 122 S. Ct. 142 (2001).

It was "clear" or "obvious" error to instruct on Fourteenth Amendment due process, because the district court's summary judgment holding precluded that ground. Moreover, in the light of *Albright* and our subsequent case law interpreting it, the identification of the "right to due process" as the constitutional right at issue in a § 1983 malicious prosecution claim was an obviously incorrect statement of the law.

The next inquiry is whether this error affected the substantial rights of Fragozo and Sanchez. Militating *against* holding that the error had such an effect is the fact that, although the district court misnamed the constitutional right at issue, the jurors were instructed they could find for Castellano *only* if they found each of the common-law elements was satisfied. And, as discussed, apparently under our circuit precedent, the elements amounted to the violation, regardless of how the court erroneously labeled it.

Nevertheless, using the words "constitutional right of due process" instead of "constitutional right against unreasonable seizure" probably altered the verdict. The jury's damages findings were keyed to the entire criminal proceeding — as instructed, "acts that deprived [Castellano] of due process" — instead of the more discrete "seizure" violative of the Fourth Amendment. Reading the instructions as a whole, as we must, the clear error was further compounded by the interrogatories to the jury, which asked, for example, whether Defendants "deprived Castellano of his constitutional *rights* [note the plural form] by committing malicious prosecution". (Emphasis added.) Throughout, for liability and damages, the interrogatories speak of the "violation of [Castellano's] constitutional rights".

72

Viewing the instructions as a whole, this harkens to the "generalized" and "open-ended" concept of substantive due process rejected in *Albright*. As a result, Fragozo and Sanchez, in their individual capacities, were each found liable for *$1.5 million* for causing the brief, albeit unreasonable, arrest and detention of Castellano. In that light, the district court's error affected their substantial rights.

Concerning the last (discretion) prong in our analysis for reversible plain error, a $3-million compensatory damage award for *a constitutional tort that does not exist* (§ 1983 malicious *prosecution grounded in due process*) "seriously affect[s] the fairness of" this trial. *Olano*, 507 U.S. at 732. Likewise, permitting such damages to stand would seriously affect the "integrity [and] public reputation of [these] proceedings". *Id.* Accordingly, I would hold that the erroneous instruction constituted reversible plain error.

### III.

For the foregoing reasons, it is hoped that en banc review will be granted for this case to not only correct the reversible error caused by the jury instructions, but also to correct our "confused and confusing" precedent for § 1983 malicious prosecution claims. I respectfully dissent.